# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
September 5, 2001 Session

## STATE OF TENNESSEE v. BOBBY G. GODSEY

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Sullivan County**
**No. S38648     R. Jerry Beck, Judge**

———————————

**No. E1997-00207-SC-R11-DD - Filed November 29, 2001**

———————————

Bobby G. Godsey was convicted of first degree felony murder during the perpetration of aggravated child abuse. Following a sentencing hearing, the jury imposed a sentence of death upon finding that the single aggravating circumstance, "[t]he murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older,"[1] outweighed mitigating circumstances beyond a reasonable doubt. The defendant was also convicted of aggravated child abuse, and the trial court imposed a consecutive sentence of twenty-five years for this conviction. The Court of Criminal Appeals reversed Godsey's conviction for aggravated child abuse, concluding that the General Assembly did not intend to permit a separate conviction and punishment for aggravated child abuse when the defendant has been convicted of first degree felony murder during the perpetration of aggravated child abuse. The Court of Criminal Appeals affirmed Godsey's conviction for first degree murder. However, the Court of Criminal Appeals found the sentence of death comparatively disproportionate to the penalty imposed in similar cases and modified Godsey's sentence to life imprisonment without the possibility of parole. Both Godsey and the State filed applications for permission to appeal, which were granted by this Court. After carefully reviewing the record and the relevant legal authorities, we affirm that portion of the Court of Criminal Appeals' decision finding the sentence of death disproportionate and modifying the defendant's sentence to life imprisonment without the possibility of parole. We reverse that portion of the Court of Criminal Appeals' decision finding dual convictions for felony murder by aggravated child abuse and aggravated child abuse inappropriate and reinstate the defendant's separate conviction and sentence for aggravated child abuse. In all other respects, the decision of the Court of Criminal Appeals is affirmed.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Affirmed in Part and Reversed in Part**

———————————

[1] Tenn. Code Ann. §39-13-204(i)(1).

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, JANICE M. HOLDER and WILLIAM M. BARKER, JJ. joined. ADOLPHO A. BIRCH, JR., filed a concurring & dissenting opinion.

Stephen M. Wallace, District Public Defender, Blountville, Tennessee and James T. Bowman, Johnson City, Tennessee, for the appellant/appellee, Bobby G. Godsey

Paul G. Summers, Attorney General & Reporter; Michael Moore, Solicitor General; Alice B. Lustre, Assistant Attorney General; H. Greeley Wells, District Attorney General; and Barry Staubus, Assistant District Attorney General, for the appellee/appellant, State of Tennessee.

**OPINION**

**Guilt Phase Proof**

The proof offered during the guilt phase of the trial demonstrates that during the fall of 1995, the defendant, twenty-two-year-old Bobby Godsey, moved into an apartment with his girlfriend, Robin Marshall, and her three children: five-year-old Ginger, four-year-old Dylan, and seven-month-old Evan Price, the victim in this case. On January 1, 1996, Ms. Marshall spent the day with her children and her friend, Christy Christian, and Christian's children. Godsey arrived home from work around 4:30 p.m. A short time later, Ms. Marshall left the victim alone with Godsey while she drove Christian to her apartment on the other side of the complex.[2] When Ms. Marshall returned a short time later,[3] the victim was lying on her bed. She offered to put the victim to bed in his crib, but the defendant said he would do it. Ms. Marshall went downstairs and began preparing dinner. Godsey came downstairs a short time later, and Ms. Marshall and Godsey watched a videotaped movie for approximately one hour. When Godsey went upstairs around 7:15 p.m. to wake the victim for dinner, he discovered the victim was not breathing. Godsey brought the victim downstairs, and while Ms. Marshall called 911, the defendant attempted CPR. Because the hospital was next door to the apartment complex, Ms. Marshall decided to drive the victim to the hospital herself.[4] When Ms. Marshall arrived at the hospital, the victim was not breathing and his heart was not beating. He had vomit on his face, and small bruises on his jaw, forehead, and ear, but he was not bleeding externally. After approximately 27 minutes, medical personnel successfully resuscitated him and inserted an endotracheal tube. X-rays revealed a "twist-type" fracture of the victim's arm above the right elbow and suggested a skull fracture. X-rays also revealed that the endotracheal tube was not properly positioned and therefore was not properly ventilating both lungs. The tube was retracted to correct the problem.

---

[2]At this time, Ms. Marshall's other children were visiting her mother.

[3]Ms. Marshall testified that she was gone six minutes. The defendant stated that she was gone three minutes at most.

[4]The defendant did not accompany Ms. Marshall to the emergency room because he was not dressed and because he had to arrange care for Christian's daughter who had remained with Ms. Marshall after Christian went home.

Because further tests were needed, the victim was transferred to the pediatric intensive care unit at the Johnson City Medical Center. A CAT[5] scan revealed three skull fractures, two on one side and one on the other side of the back half of the victim's skull. The scan also showed moderately severe to severe brain swelling. Further medical examinations revealed bilateral retinal hemorrhages.

Ms. Marshall and the defendant spent the night and most of the next day at the hospital waiting for news about the victim. At noon on January 2, Detective Darla Anderson of the Kingsport Police Department came to the hospital and interviewed Godsey about the victim's injuries. He told Detective Anderson that for approximately five months he had lived with Ms. Marshall and her three children. He stated that he provided care for the children in the evenings from 8:00 or 9:00 p.m. until approximately 10:45 or 11:00 p.m., while Ms. Marshall worked. Godsey admitted that he had put the victim down for a nap before going downstairs to watch a movie with Ms. Marshall, but Godsey said the victim was fine at that time. When Godsey returned an hour later, he noticed the victim was not breathing. Godsey suggested that the victim's arm may have been injured when Godsey moved him onto the toddler bed and unsuccessfully attempted CPR. Godsey said some "yellow stuff" came out of the victim's mouth, but the victim was not breathing. Godsey then carried the victim downstairs and asked Ms. Marshall to call 911.

Later that afternoon, Detective Anderson drove to the victim's apartment and met Godsey as he was returning to the hospital. Godsey drove back to the apartment and allowed Detective Anderson to inspect and photograph the victim's bedroom, even though Detective Anderson did not have a search warrant. Detective Anderson photographed the room and noted that the crib was located approximately two feet from the toddler bed and that the toddler bed was approximately six inches from the floor. Detective Anderson found toys scattered inside the crib and stains on the sheet. Detective Anderson did not notice any blood or damaged items in the room. Godsey also allowed Detective Anderson to remove the crib sheet and blanket from the victim's bed, and Godsey gave Detective Anderson the t-shirt he had worn the previous day. Godsey explained that the victim had been teething, his gums had been bleeding, and the t-shirt had the victim's teething blood on it. Godsey also told Detective Anderson about the victim vomiting in the car on the way to the emergency room, and Detective Anderson photographed the stains. Detective Anderson stated that the defendant freely provided information and described him as cooperative at the time she examined the apartment. At trial, the State offered DNA test results to show that the stains on the crib sheet and on the defendant's t-shirt were blood stains and that the blood had come from the victim. However, hospital personnel testified that the victim was not bleeding externally when he arrived at the emergency room, and the autopsy showed no signs of external bleeding.

Godsey returned to the hospital after speaking with Detective Anderson, and later that evening, around 6 p.m., life support was withdrawn because the victim was brain dead. Hospital

---

[5] A CAT scan, or computerized axial tomography, involves the use of x-rays to gather "anatomical information from a cross-sectional plane of the body . . . ." Steadman's Medical Dictionary 1459 (5th ed. 1984).

personnel testified that both Ms. Marshall and Godsey were distraught and upset about the child's death.

An autopsy revealed that the victim had suffered a severe blow to the back of his head, causing skull fractures, brain swelling, and a lack of oxygen to the brain, which led to his death. Bleeding into the soft tissue of the scalp around the fractures was also discovered, but no intracranial bleeding was present, and no bone displacement was detected. The autopsy confirmed that the skull fractures and the arm fracture occurred at approximately the same time. In addition, the autopsy revealed a laceration of one of the victim's intervertebral discs. The autopsy also revealed that the victim was suffering from hypostatic pneumonia, which occurs when the brain is so damaged that it cannot produce coughing or clear secretions. In this case, the condition was worsened because a small amount of vomit had been inhaled into the victim's lungs. The autopsy revealed no evidence of prior injuries or abuse.

Ms. Marshall and Godsey returned to their apartment after the victim died, and shortly thereafter, officers of the Kingsport Police Department arrived and asked them to come to the police department for further interviews. After being advised of his Miranda[6] warnings, Godsey signed a waiver, agreeing to talk to police. Godsey's recollection of the events leading up to Ms. Marshall's departure from the apartment was consistent with his earlier statement. He again initially denied any wrongdoing. Eventually, however, Godsey revealed that, during the short time Ms. Marshall had been gone, he had become angry and had physically abused the victim because he would not stop crying.

Godsey, however, gave the police several differing accounts of what had happened. In three very similar statements, Godsey said that he had been swinging the victim by his ankles to stop his crying and had hit the victim's head on the toddler bed rail and his head and arm on the floor. In another statement, which he prefaced by saying, "I'm going to tell you the truth," Godsey admitted he became irritated by the victim's crying, grabbed him by the arm and leg, jerked him out of the crib, even though the child's arm was caught between the crib railing, and threw the victim toward the toddler bed, two feet away. The victim missed the bed, landed on the tile floor, slid under the bed, and hit the wall. Following a break in the interview, Godsey gave a final statement, which was reduced to writing and signed at 3:40 a.m. In it, the defendant said that, angered by the victim's crying, he squeezed the victim's head between his biceps and forearm for about ten seconds, until the victim stopped crying. When he stopped squeezing, the victim was huffing short breaths. Nonetheless, the defendant claimed that the child was still breathing when the defendant returned him to his crib. When asked by the officers why he had given so many differing statements about the incident, Godsey responded, "I wanted it to look like an accident." Godsey was immediately arrested for the murder of Evan Price.

The State offered several medical expert witnesses including, Dr. Bickley Craven, who treated the victim at Holston Valley Hospital. Dr. Craven confirmed that the victim had been treated

---

[6] See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

with an antibiotic for sinusitis some twelve days before this incident, and at that time, there was no evidence of abuse. Dr. Craven also testified that the child's medical records from the Family Practice Center, where the child had been seen several times for ear and respiratory infections, did not indicate prior abuse.

Dr. Mohon, a pediatric physician who treated the victim at the Johnson City Medical Center, opined that most of the explanations given by the defendant could not have caused the victim's severe injuries. However, he testified that the injuries were consistent with the account that the defendant had grabbed the victim by the arm and leg, caught the victim's arm in the crib railing, and then thrown the victim so forcefully that he hit the tile floor and slid under the bed and against the wall. However, Dr. Mohon acknowledged that there was no sign of older injuries indicative of previous child abuse and conceded that the injuries could have been caused by reckless or grossly negligent behavior.

Testifying for the defense, Ms. Marshall, the victim's mother, said the defendant usually was responsible for the care of her children between 8:00 and 10:30 p.m. each night, that he had a good relationship with the victim and with her other two children, and that she had not seen or heard the defendant abuse the victim on the night of the incident, although she conceded that she did not know what occurred while she was driving her friend home. Ms. Marshall testified that the victim suffered frequent respiratory infections, and at the time of this incident, he had been cutting teeth, which caused his gums to bleed. She said that the blood stains on the defendant's t-shirt came from the victim's bleeding gums. She asserted that the defendant had never struck the victim or been "mean to him."

Daniel Christian, a friend and former roommate and co-worker of the defendant, testified that the defendant loved the victim and had served in a "fatherly role" to the victim, providing both monetary and emotional support. Christian recalled that the defendant had turned down his invitation to attend the Citrus Bowl in Florida so that he could spend the holidays with Ms. Marshall and her children.

The defendant's employer, Silas Jenkins, characterized the defendant as an excellent worker. Jenkins had seen the defendant with the victim on two occasions and noticed the defendant had a good relationship with the victim and provided good care to the victim.

Christy Christian, a neighbor and friend, testified that the defendant had always been kind with the children, providing for them financially. She said the defendant had an especially good relationship with the victim, treating the victim as his own child. Christian heard the defendant playing with the victim just before she left with Ms. Marshall to go to her own apartment on the evening the incident occurred.

Scotty Trivett, who had been at the hospital on the night the victim was admitted, testified that the victim's head struck the hospital door when Ms. Marshall jerked it open and carried the victim inside, screaming for help. Trivett also testified that the defendant arrived at the hospital

about thirty minutes later, very upset, crying and hugging Ms. Marshall. Trivett called police to report what he had witnessed when he heard a television account indicating that the defendant had been charged with murder. On cross-examination, Trivett acknowledged that the victim appeared to be dead when Ms. Marshall carried him into the hospital.

Ruby Metros, an oncology social worker at the Johnson City Medical Center, stayed with Ms. Marshall and the defendant throughout most of the day on January 2, 1996. She testified that, at times, they appeared relatively calm, and at other times, they appeared very upset. Metros said the defendant was very emotional when he learned that the victim would be disconnected from life support and when he was allowed to go into the victim's hospital room for the last time.

Dr. Geoffrey Boercker, a specialist in trauma medication, testified that most of the victim's brain injuries were caused by heart stoppage and that the arm fracture probably occurred around the time of the cardiac arrest. He opined that the victim's torn disc could have been caused by the victim striking the metal frame on the toddler bed. Dr. Boercker also testified that misplacement of the endotracheal tube lessened what little chance the victim had for survival. Dr. Boercker noted that the victim had, in fact, been teething at the time of his death. Dr. Boercker testified at length as to the various classes of injuries associated with an abused child and noted an absence of any of these injuries and of any indication of prior abuse. Dr. Boercker also noted the absence of either epidural or subdural hematomas, which are normally present in severe deceleration head injuries. The absence of these injuries led Dr. Boercker to conclude that the victim's death was caused by a cardiopulmonary arrest rather than "traumatic brain injury, child abuse/non-accidental trauma," as noted by the autopsy. Dr. Boercker said that the head trauma in this case was not severe enough to cause a cardiac arrest. Dr. Boercker opined that the head trauma likely caused vomiting, which resulted in a laryngospasm that closed the victim's airways and caused respiratory arrest, and eventually, cardiac arrest. Dr. Boercker conceded that even if his opinion as to cause of death is correct, the head trauma precipitated the cardiopulmonary arrest, which caused the victim's death.

In rebuttal, Dr. William McCormick, the medical examiner who performed the autopsy, testified that the victim's spinal injury and broken arm had occurred simultaneously with the cardiopulmonary arrest. Dr. McCormick also stated that the victim's death was not caused by aspirating vomit because the victim had only a small amount of vomit in his lungs. On cross-examination, Dr. McCormick opined that the injuries sustained by the victim could have been the result of either reckless or intentional conduct.

Based upon this proof, the jury found the defendant guilty of first degree murder by aggravated child abuse and aggravated child abuse. The trial proceeded to the sentencing phase on the first degree murder conviction.

### Sentencing Phase Proof
The State presented no further proof at the sentencing hearing, relying upon the proof at trial to establish the single aggravating circumstance, "[t]he murder was committed against a person less

than twelve (12) years of age and the defendant was eighteen (18) years of age, or older." Tenn. Code Ann. §39-13-204(i)(1).

The defendant presented the testimony of several witnesses, all of whom testified about his background and life. The defendant had suffered an unstable childhood in a poor, dysfunctional family that moved frequently. The defendant had moved at least ten times by age seventeen. He had been trapped in a house fire at the age of four; and his father was an alcoholic, who became emotionally abusive upon discovering that the defendant's mother had a child as the result of an extramarital affair. The defendant's parents divorced when he was five years old, and his father had provided no financial or emotional support to the defendant thereafter. The defendant's step-father also abused alcohol and was emotionally abusive toward the defendant, often totally ignoring the defendant, who looked like his biological father, while showering attention on the defendant's brother and sister.

The defendant was of above average intelligence and performed very well in elementary school. He was described by his teachers as a sweet child, very shy, studious, but accident-prone. When the defendant was thirteen years old, his mother began caring for a baby girl, the child of a friend. The defendant was left on his own and began using alcohol and marijuana. By fourteen, the defendant was adjudged a delinquent and lived in a juvenile home for several months. He was released to return to his own high school by his sophomore year, but he did not perform well. His grades were very poor, and he skipped school a great deal. He quit school during his junior year of high school and began working. He was seriously involved with his girlfriend and was devastated when she moved. She was pregnant with his child when she left, but the defendant was not aware of the pregnancy. She returned when the child was two and one-half months old and left the child with the defendant and his mother. The defendant helped his mother care for the baby, and he bought the child diapers and other needed items. The defendant and his family cared for the child for six and one-half months, but when the child was eight and one-half months old, the child's mother took the baby on the pretext of having a photograph taken and never returned. Later, the defendant's mother learned from a newspaper notice that the child had been placed for adoption. The defendant's mother wrote a letter, but was informed that she had no legal right or claim to the child. The defendant and his family never saw the child again. The defendant's mother said the child's adoption had a devastating effect on the defendant.

Later, the defendant attempted to join the army with his best friend. The defendant scored very high on the recruitment screening test, but he was seventeen years old and needed parental consent to complete the process. The defendant was very disappointed when his father refused to give his consent, and the defendant was unable to join when he turned eighteen because the military had changed its policy by that time and would not accept persons who had no high school diploma. Since turning eighteen, the defendant has been convicted of joyriding, driving under the influence of an intoxicant, underage possession of alcohol, and driving on a revoked license – all misdemeanor offenses. The defense rested after the defendant's mother testified, expressing love for her son and asking the jury to spare his life.

The trial court instructed the jury as to the single aggravating circumstance and as to seventeen mitigating circumstances raised by the evidence. The jury determined that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt and sentenced the defendant to death. The trial court imposed a consecutive twenty-five-year sentence for the aggravated child abuse conviction.

As stated, the Court of Criminal Appeals affirmed the first degree murder conviction, but found the death sentence disproportionate and modified the sentence to life imprisonment without the possibility of parole. The Court of Criminal Appeals also vacated the conviction for aggravated child abuse, finding no legislative intent to permit a separate conviction and punishment for aggravated child abuse when the defendant has been convicted of first degree felony murder during the perpetration of aggravated child abuse. We granted both the State's and the defendant's applications for permission to appeal and now affirm in part and reverse in part the decision of the Court of Criminal Appeals.

## Electronic Recording of Statement

When initially interviewed by the police, the defendant denied knowing anything about how the victim sustained the injuries resulting in his death. Questioning proceeded and the defendant gave about nine different versions of what occurred. One of the officers present during the interrogation testified that the defendant prefaced the eighth version by saying he was "going to tell . . . the whole truth." The defendant then acknowledged that he had attempted to throw the victim onto the bed, that the victim missed, hit the floor, slid under the bed, and hit the wall. This account, the eighth version, was most consistent with the physical injuries sustained by the victim. After this statement, there was a break in the interview, and when it resumed, the defendant refused to sign the written statement recounting the eighth version. Instead, he maintained that he did not throw the victim but had squeezed the victim's head in an effort to stop his crying, and he signed a written statement to this effect. No part of the interrogation was electronically recorded. The detectives acknowledged that they could have easily obtained a tape recorder, but explained that "we don't normally, as a rule, record our interviews."

As in the Court of Criminal Appeals, the defendant contends in this Court that his statements to the police should have been suppressed because they were not electronically recorded. He relies upon decisions from two other state supreme courts requiring that custodial interrogations be recorded. See Stephan v. State, 711 P.2d 1156 (Alaska 1985); State v. Scales, 518 N.W.2d 587 (Minn. 1994).

In Stephan, the Alaska Supreme Court held that the failure of police to create an electronic recording of a custodial interrogation occurring in a place of detention generally violates the due process rights of a suspect under the Alaska Constitution. Stephan, 711 P.2d at 1159. Specifically, the court found that because of its ease and inexpense, particularly in the context of custodial interrogations in detention facilities, recording "is now a reasonable and necessary safeguard, essential to the adequate protection of the accused's right to counsel, his right against self incrimination and, ultimately, his right to a fair trial." Id. at 1159-60. The

-8-

Alaska court concluded that absent a justifiable excuse, the failure to record a custodial interrogation will render any statement received therein inadmissible during trial. Id.

The Minnesota Supreme Court imposed a similar electronic recording obligation pursuant to its supervisory powers. Scales, 518 N.W.2d at 592. In establishing this prospective rule, the Minnesota Supreme Court concluded that statements obtained from a suspect in substantial violation of the recording requirement would be suppressed. Id. at 592. Unlike the Alaska Supreme Court, the Minnesota Supreme Court refused to determine whether the Minnesota Constitution supported imposition of the requirement.

The defendant admits that there is no authority in Tennessee requiring that interrogations be electronically recorded. The defendant relies upon State v. Livesay, 941 S.W.2d 63, 65 (Tenn. Crim. App. 1996), which held that refusing to allow a defendant to obtain an independent blood analysis in a drunk driving prosecution is tantamount to suppression of evidence favorable or useful to the defense and is a violation of a defendant's statutory and due process rights. The defendant asserts that the failure of the officers in this case to electronically record the interrogation violated his due process rights by denying him the only opportunity to have an exact record of what he said to the police.

In our view, the Court of Criminal Appeals properly distinguished Livesay. There, independent blood tests were necessary to enable the defendant to test the accuracy of and to rebut the State's proof. Here, in contrast, the defendant does not ask that evidence be preserved; he asks that it be gathered in a certain form. The evidence is not lost merely because the interrogation was not recorded. The officers were present at the interrogation, and more importantly, the defendant was present at the interrogation. Lack of an electronic recording did not preclude the defendant from challenging the accuracy of the officers' recollection of the interrogation.

Moreover, as the Court of Criminal Appeals observed, neither the state nor the federal constitution requires electronic recording of interrogations. We have found at least fifteen other states that have declined to impose such a requirement when faced with the issue.[7] See Daniel

---

[7] People v. Holt, 937 P.2d 213 (Cal. 1997) (holding that the failure to record statements did not violate the due process clause of either the state or federal constitution); People v. Raibon, 843 P.2d 46 (Colo. Ct. App. 1992) (holding that the failure to videotape or audiotape the defendant's statements did not violate the defendant's due process rights under the Colorado Constitution); Coleman v. State, 375 S.E.2d 663 (Ga. Ct. App. 1988)(holding that police were not required to electronically record the defendant's custodial statements in order for the statements to be admissible); State v. Kekona, 886 P.2d 740 (Haw. 1994) (holding that the failure to electronically record custodial interrogation was not a due process violation); State v. Rhoades, 820 P.2d 665 (Idaho 1991) (holding that statements made in custody do not have to be tape-recorded in order to be admissible); People v. Everett, 543 N.E.2d 1040 (Ill. Ct. App. 1989) (holding that the failure to record defendant's statements did not violate the due process clause of the Illinois Constitution); Stoker v. State, 692 N.E.2d 1386 (Ind. Ct. App. 1998) (holding that the Indiana Constitution imposed no specific duty upon law enforcement officers to record or preserve custodial interrogations in places of detention); State v. Buzzell, 617 A.2d 1016 (Me. 1992) (holding that the due process clause of the Maine Constitution does not require recording
(continued...)

-9-

Donovan & John Rhodes, Comes a Time: The Case for Recording Interrogations, 61 Mont. L. Rev. 223, 232, n.52 (Winter 2000). There can be little doubt that electronically recording custodial interrogations would reduce the amount of time spent in court resolving disputes over what occurred during the interrogation. As a result, the judiciary would be relieved of much of the burden of resolving these disputes. In light of the slight inconvenience and expense associated with electronically recording custodial interrogations, sound policy considerations support its adoption as a law enforcement practice. However, "[t]he determination of public policy is primarily a function of the legislature." Griffin v. Shelter Mut. Ins. Co., 18 S.W.3d 195, 200-01 (Tenn. 2000). As we commented in State v. Odom, 928 S.W.2d 18, 23-24 (Tenn. 1996), the issue of electronically recording custodial interrogations "is one more properly directed to the General Assembly." Id. The defendant's claim that his statement should have been suppressed because it was not electronically recorded is without merit.

## Constitutionality of the Felony Murder Statute

The next general issue raised by the defendant is whether the 1995 amendment[8] to Tennessee's first degree murder statute violates due process or amounts to cruel and unusual punishment under the state and federal constitutions. Specifically, the statute under which the defendant was prosecuted and convicted provides in pertinent part as follows:

> (a) First degree murder is . . . (2) A killing of another committed in the perpetration of or attempt to perpetrate . . . aggravated child abuse . . . . (b) No culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts in such subdivisions.

Tenn. Code Ann. § 39-13-202(a)(2) & (b). Prior to 1995, aggravated child abuse was not one of the enumerated felonies capable of supporting a charge or conviction of first degree felony murder. Additionally, between 1989 and 1995, the required mental state for felony murder was recklessness. Tenn. Code Ann. 39-13-202(a)(2) (1991 Repl.).

---

[7](...continued)
of custodial interrogations); Commonwealth v. Diaz, 661 N.E.2d 1326 (Mass. 1996) (holding that custodial statements did not have to be suppressed even though they were not electronically recorded); People v. Fike, 577 N.W.2d 903 (Mich. Ct. App. 1998)(holding that the due process clause of the Michigan Constitution does not require the recording of custodial confessions); Williams v. State, 522 So.2d 201 (Miss. 1988)(refusing to require electronic recording of custodial interrogation as a prerequisite to admissibility); Commonwealth v. Craft, 669 A.2d 294 (Pa. Super. Ct. 1995) (holding that the Pennsylvania Constitution does not require recording of custodial interrogations); State v. James, 858 P.2d 1012 (Utah Ct. App. 1993) (holding that the Utah Constitution does not require electronic recording of custodial interrogations); State v. Gorton, 548 A.2d 419 (Vt. 1988) (refusing to adopt a constitutional rule requiring the taping of custodial interrogations); State v. Kilmer, 439 S.E.2d 881 (W. Va. 1993) (holding that the due process clause of the West Virginia Constitution does not require that police electronically record custodial interrogations).

[8]1995 Tenn. Pub. Acts 460.

The defendant first contends that by deleting the culpable mental state of reckless, the 1995 amendment rendered the statute unconstitutional. We disagree. In State v. Barber, 753 S.W.2d 659, 671 (Tenn. 1988), this Court considered and upheld the constitutionality of the pre-1989 statute, which did not contain a culpable mental state. In State v. Middlebrooks, 840 S.W.2d 317, 336 (Tenn. 1992), we reaffirmed our decision in Barber and upheld the constitutionality of the felony murder statute even though it did not contain a culpable mental state. Even more recently in State v. Kimbrough, 924 S.W.2d 888, 890 (Tenn. 1996), we described the felony murder doctrine as follows:

> In the typical case of felony-murder, there is no malice in 'fact' with respect to the homicide; the malice is supplied by the 'law'. There is an intended felony and an unintended homicide. The malice which plays a part in the commission of the felony is transferred by law to the homicide. As a result of the fictional transfer, the homicide is deemed committed with malice.

Contrary to the defendant's assertion, the 1995 amendment to the first degree murder statute did not fundamentally change the felony murder doctrine so as to render the statute unconstitutional. With respect to the culpable mental state, the 1995 amendment merely returned the felony murder statute to its pre-1989 form. Moreover, like the other enumerated felonies, the predicate felony in this case, aggravated child abuse, includes a culpable mental state – "knowingly." Consistent with the traditional felony murder doctrine, the statute as amended in 1995 requires the State to prove that the predicate felony was committed with the applicable culpable mental state. Therefore, the defendant's claim that the statute violates due process by failing to include a culpable mental state is without merit.

The defendant also asserts that because the killing in this case resulted from knowing conduct, the facts do not establish a "reckless disregard for human life," as required by Tison v. Arizona, 481 U.S. 137, 107 S. Ct. 1676, 1688, 95 L. Ed. 2d 127 (1987), to constitutionally support imposition of the death penalty. We disagree. First, as the Court of Criminal Appeals also correctly pointed out, Tison involved defendants who themselves did not kill the victims. Here the defendant's own actions killed the victim. In Enmund v. Florida, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 147 (1982), the United States Supreme Court approved the imposition of the death penalty on the actual killer in a felony murder, and the Court in Tison reaffirmed this position with respect to participants in a felony murder who exhibit reckless indifference to human life. Furthermore, the culpable mental state for aggravated child abuse, "knowing," is a higher standard than "reckless indifference." See Tenn. Code Ann. § 39-11-106(a)(2)(20) (defining knowing). Therefore, the Court of Criminal Appeals correctly concluded that both the statutory elements and the facts of this case establish reckless indifference.

The defendant's next argument is that the statute violates due process because the acts constituting the aggravated child abuse upon which the felony murder conviction is based are the same acts that caused the victim's death. The defendant contends that due process requires that the underlying felony be based upon acts separate from those causing death. The defendant

points to other jurisdictions that apply the merger doctrine to preclude a felony murder conviction based on assaultive offenses. See State v. Wanrow, 588 P.2d 1320, 1322-1324 (Wash. 1978); see generally Annotation, "Application of Felony-Murder Doctrine Where the Felony Relied upon Is an Includible Offense with the Homicide," 40 A.L.R.3d 1341 (1971). The State responds that the merger doctrine is a rule of statutory construction, not a principle of constitutional law, and that the rule applies only when the legislature has not enumerated the felonies that will support a conviction for felony murder. We agree.

> Conceived in the nineteenth century, the merger doctrine was developed . . . as a shorthand explanation for the conclusion that the felony-murder rule should not be applied in circumstances where the only underlying (or "predicate") felony committed by the defendant was *assault*. The name of the doctrine derived from the characterization of the assault as an offense that "merged" with the resulting homicide.

People v. Hansen, 885 P.2d 1022, 1028 (Cal. 1994) (emphasis in original). More broadly, "the merger doctrine bars the use of the felony murder rule when the underlying felony directly results in, or is an integral part of, the homicide." Barnett v. State, 783 So.2d 927, 930 (Ala. Crim. App. 2000); see also State v. Campos, 921 P.2d 1266, 1270-72 (N.M. 1996)(outlining varying applications of the merger doctrine in different jurisdictions).

Courts have generally declined to hold that the merger doctrine implicates any principle of constitutional law. See e.g., Rhode v. Olk-Long, 84 F.3d 284, 289 (8th Cir. 1996)(rejecting the defendant's due process challenge to her conviction of felony murder based upon child endangerment because the argument lacked a constitutional basis, depending instead upon the merger doctrine); State v. Lopez, 847 P.2d 1078, 1089 (Ariz. 1992)(observing that the court could conceive of no constitutional impediment "precluding the legislature from classifying child abuse that results in the death of the child as a predicate felony that triggers the felony-murder statute"); Mapps v. State, 520 So.2d 92, 93-94 (Fla. Dist. Ct. App. 1988)(rejecting the argument that the felony murder statute that included aggravated child abuse as a predicate offense was unconstitutional); State v. Tremblay, 479 P.2d 507, 511 (Or. Ct. App. 1971)(observing that the merger doctrine does not implicate any principle of constitutional law). Instead, courts have viewed the merger doctrine as a principle for discerning legislative intent and, more specifically, as a principle that preserves "some meaningful domain in which the Legislature's careful graduation of homicide offenses can be implemented." Hansen, 885 P.2d at 1028. Accordingly, the merger doctrine has not been widely accepted. See Cotton v. Commonwealth, 546 S.E.2d 241, 244 (Va. Ct. App. 2001). The doctrine has been applied largely in those states where the felony murder statute fails to specifically list the felonies capable of supporting a felony murder conviction.[9] Where a "legislature explicitly states that a particular felony is a predicate felony

---

[9]See, e.g., Barnett, 783 So.2d at 930-31 (applying the merger doctrine where the first degree felony murder statute allowing conviction based upon certain enumerated felonies and "any other felony clearly dangerous to human
(continued...)

for felony-murder, no 'merger' occurs." Lopez, 847 P.2d at 1089; see also Mapps, 520 So.2d at 93; Huntley v. State, 518 S.E.2d 890, 893 (Ga. 1999); State v. Rhomberg, 516 N.W.2d 803, 805 (Iowa 1994); People v. Jones, 530 N.W.2d 128, 129 (Mich. Ct. App. 1995); State v. Cromey, 348 N.W.2d 759, 760 (Minn. 1984); Faraga v. State, 514 So.2d 295, 302-03 (Miss. 1987); State v. Williams, 24 S.W.3d 101, 115-17 (Mo. Ct. App. 2000); State v. McCann, 907 P.2d 239, 241 (Okla. Crim. App. 1995); Tremblay, 479 P.2d at 511; see generally 40 Am. Jur. 2d. Homicide § 66 (1999).

As the Court of Criminal Appeals in this case recognized, the General Assembly has expressed an unmistakable intent to have aggravated child abuse qualify as a felony capable of supporting a conviction of first degree felony murder. Under such circumstances, the merger doctrine should not be applied to preclude a conviction for first degree felony murder, even though death is the consequence of an aggravated child abuse. The defendant's assertion that the merger doctrine bars his conviction for felony murder is without merit.

Finally, the defendant argues that predicating felony murder on aggravated child abuse violates the due process restrictions of State v. Anthony, 817 S.W.2d 299, 306 (Tenn. 1991), unless the aggravated child abuse substantially increases the risk of harm over and above that necessarily present in the crime itself. We disagree. In Anthony, this Court held that dual convictions for kidnapping and robbery are inappropriate if the kidnapping is essentially incidental to the robbery. In contrast, a murder qualifies as felony murder only if the underlying felony is closely connected to the killing in time, place, causation, and continuity of action. State v. Pierce, 23 S.W.3d 289, 295 (Tenn. 2000). In other words, the felony murder doctrine requires that underlying felonies be "incidental" to the killing in time, place, causation, and continuity of action. Id. Applying Anthony as the defendant suggests would require rejection of this long-standing portion of the felony murder doctrine. The analysis employed in Anthony to determine the permissibility of dual convictions is simply inapplicable in the context of determining whether a felony may properly support a conviction of felony murder.

---

[9](...continued)
life"); Hansen, 885 P.2d at 1025-1026 (applying the merger doctrine where the second degree felony murder statute authorized conviction for a killing committed during any felony inherently dangerous to human life); Foster v. State, 444 S.E.2d 296, 297 (Ga. 1994)(applying the merger doctrine where a first degree felony murder statute authorized a conviction for a killing committed during the perpetration of "a felony"); People v. Morgan, 718 N.E.2d 206, 209 (Ill. App. Ct. 1999)(applying the merger doctrine where a first degree felony murder statute authorized conviction for a killing committed during the perpetration of any forcible felony); Commonwealth v. Wade, 697 N.E.2d 541, 545-546 (Mass. 1998)(applying the merger doctrine where the first degree felony murder statute authorized conviction for a killing committed during the perpetration of any felony punishable by life imprisonment); Campos, 921 P.2d at 1270-1272 (applying the merger doctrine where the first degree felony murder statute did not enumerate possible predicate felonies); State v. Branch, 415 P.2d 766, 767 (Or. 1966)(applying the merger doctrine where the second degree felony murder statute authorized conviction for a killing during the perpetration of any felony other than those specifically designated by the legislature as capable of supporting a first degree felony murder conviction).

**Aggravated Child Abuse:  Lesser-Included Offense**

The State charged the defendant with both felony murder and aggravated child abuse, the felony upon which the murder charge was based.  The jury convicted the defendant of both offenses, but the Court of Criminal Appeals set aside the conviction for aggravated child abuse, concluding that it is a lesser included offense of felony murder.

Initially we note that the issue presented in this case, whether dual convictions for felony murder and the predicate offense of aggravated child abuse are permitted under Tenn. Code Ann. § 39-13-202(a)(2), the felony murder statute, was expressly pretermitted in State v. Ducker.  See 27 S.W.3d 889, 893, n. 2 (Tenn. 2000).  The issue in Ducker was whether aggravated child abuse was a lesser-included offense of reckless killing of a child, pursuant to Tenn. Code Ann. 39-13-202(a)(4) (1994),[10] the statute in effect at that time.  This crime, reckless killing of a child, was defined in a statutory provision entirely separate and distinct from the statutory provision defining felony murder.   As a result, we concluded that a legislative intent to permit dual convictions and sentences did not appear to be present under the 1994 reckless killing of a child provision.  Ducker, 27 S.W.3d at 893.  We acknowledged that the statute defining as first degree murder the reckless killing of a child by aggravated child abuse was adopted by the General Assembly in response to State v. Kerry Phillip Bowers, No. 115 (Tenn. Crim. App., filed Aug. 2, 1989), and that the statute was commonly known as the "Scotty Trexler Law."  Ducker, 27 S.W.3d at 893.  The intent of this provision, we found, was not to permit dual convictions but to punish the reckless killing of a child as first degree murder.  Id.  Accordingly, in the absence of legislative intent to the contrary, we found aggravated child abuse to be a lesser included offense of reckless killing of a child.

However, in 1995, the General Assembly again amended the first degree murder statute by repealing the separate provision defining reckless killing of a child and by amending the felony murder statute to add aggravated child abuse as one of the felonies capable of supporting a conviction of first degree felony murder.  As previously stated, Godsey was prosecuted and convicted under the felony murder statute as amended in 1995.[11]  Therefore, the issue in this appeal is whether, under the 1995 felony murder statute, dual convictions for felony murder by aggravated child abuse and aggravated child abuse are permissible.

The State contends that by adding aggravated child abuse to the list of felonies capable of supporting a conviction for felony murder, the Legislature expressed its intent to permit convictions and punishment both for felony murder and for the underlying felony, aggravated

---

[10]That statute was effective until July 1, 1995 and provided in pertinent part as follows:  "First Degree murder is . . . (4) [a] reckless killing of a child less than sixteen (16) years of age, if the child's death results from aggravated child abuse, as defined by § 39-15-402, committed by the defendant against the child."

[11]The statute under which Godsey was convicted provides in pertinent part as follows:
"(a) First degree murder is . . . (2) A killing of another committed in the perpetration of or attempt to perpetrate . . . aggravated child abuse . . . . " Tenn. Code Ann. § 39-13-202(a)(2) & (b).

child abuse. In support of this argument, the State relies upon this Court's decision in State v. Blackburn, 694 S.W.2d 934, 936 (Tenn. 1985), where this Court concluded that the Legislature intended to allow multiple convictions and punishments for felony murder and the underlying felony. The State points out that in Blackburn this Court observed that "[n]othing in the statutory definitions of murder in the first degree and of the felonies listed in [the felony murder statute] indicates a legislative intent that conviction and punishment for both offenses should not be permitted." Id. 694 S.W.2d at 937.

In response, the defendant says that the Court of Criminal Appeals correctly found that the General Assembly did not intend to permit dual convictions under these circumstances. In support of this argument, the defendant relies upon Tenn. Code Ann. § 39-15-401(d) which designates child abuse and neglect as a lesser included offense "of any kind of homicide." The defendant argues that if child abuse and neglect is a lesser included offense of homicide, then aggravated child abuse, which refers to the child abuse and neglect statute, also is a lesser included offense of homicide.

While agreeing that the General Assembly has designated child abuse and neglect a lesser included offense of any kind of homicide, the State argues that the General Assembly did not designate aggravated child abuse a lesser included offense of homicide. Therefore, according to the State, the Legislature did not intend to preclude dual convictions for felony murder and aggravated child abuse. As support for this assertion, the State points to this Court's comment in Ducker, 27 S.W.3d at 893, n.1 (Tenn. 2000): "[w]hile child abuse has been explicitly designated as a lesser-include offense 'of any kind of homicide' in Tenn. Code Ann. § 39-15-401(d), the legislature has not designated *aggravated* child abuse as a lesser-included offense of 'any kind of homicide.'" (Emphasis in original.)

Generally, the State is correct in asserting that a defendant can be tried and convicted for first degree felony murder and the underlying felony in a single trial without violating the constitutional prohibitions against double jeopardy. Backburn, 694 S.W.2d at 936-37. Indeed, double jeopardy does not require dismissal or merger where "the two statutes are directed to separate evils." Blackburn, 694 S.W.2d at 936 (citing Albernaz v. United States, 450 U.S. 333, 343, 101 S.Ct. 1137 (1981)); see also State v. Denton, 938 S.W.2d 373, 377 n. 11 (Tenn.1996); State v. Lewis, 919 S.W.2d 62, 69 (Tenn.Crim.App.1995). The key issue is "whether the legislature intended cumulative punishment." Blackburn, 694 S.W.2d at 936; see also Denton, 938 S.W.2d at 379. To determine legislative intent, we look to the language of the relevant statutes.

> Child abuse and neglect is defined by Tenn. Code Ann. § 39-15-401(a), which provides:
> (a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, that if the abused or neglected child is six years of age or less, the penalty is a Class D felony.

Subsections (b) and (c) of this statute are procedural in nature. Subsection (b) addresses the authority of juvenile courts to hear matters arising under this section, and subsection (c) states that the provisions of the section are supplementary or cumulative to other statutory provisions. Subsection (d) provides in relevant part that child abuse and neglect "may be a lesser included offense of any kind of homicide, statutory assault, or sexual offense if the victim is a child and the evidence supports a charge under this section." Tenn. Code Ann. §39-15-401(d).

Aggravated child abuse is governed by Tenn. Code Ann. § 39-15-402, which provides in relevant part as follows:

(a) A person commits the offense of aggravated child abuse or aggravated child neglect who commits the offense of child abuse or neglect as defined in § 39-15-401 and:

(1)       The act of abuse or neglect results in serious bodily injury to the child; or

(2)       A deadly weapon is used to accomplish the act of abuse.

( b) A violation of this section is a Class B Felony; provided, that, if the abused or neglected child is six (6) years of age or less, the penalty is a Class A felony.

(Emphasis added.) While the Legislature has specifically provided that child abuse and neglect "may be a lesser included offense of any kind of homicide," the aggravated child abuse statute is silent and contains no similar designation. "Omissions are significant when statutes are express in certain categories but not others." Carver v. Citizen Util. Co., 954 S.W.2d 34, 35 (Tenn. 1997). In addition, as the State contends, the aggravated child abuse statute incorporates only subsection (a), that portion containing the definition of child abuse and neglect. The aggravated child abuse statute does not even refer to subsection (d), the portion of the statute designating child abuse and neglect a lesser included offense of homicide. Given that subsection (a) is separate and distinct from subsection (d), incorporation of subsection (a) does not mean that subsection (d) has also been incorporated.

Finally, and perhaps most importantly, this Court's decision in Blackburn, permitting dual convictions for felony murder and the underlying felony in the absence of a clearly expressed legislative intent to the contrary, was rendered in 1985. The General Assembly is presumed to know the state of the law at the time it acts. See, e.g., Washington v. Robertson County, 29 S.W.3d 466, 473 (Tenn. 2000). Therefore, when the General Assembly amended the felony murder statute in 1995 to add aggravated child abuse to the list of felonies capable of supporting a felony murder conviction, the General Assembly is presumed to have known that dual convictions for felony murder and aggravated child abuse would be permissible in the absence of a clear intent to the contrary. Although the General Assembly specifically designated child abuse and neglect a lesser included offense of homicide, there is no similar designation for aggravated child abuse. Indeed, we have evaluated the relevant statutes and find no clearly expressed legislative intent to prohibit dual convictions. As previously stated, the key issue in multiple punishment cases is legislative intent. Denton, 938 S.W.2d at 379. Where the Legislature has indicated that cumulative punishment is intended, the double jeopardy analysis need not proceed any further. Id., 938 S.W.2d at 379, n.14. In this case, reading the child abuse

and neglect, aggravated child abuse, and felony murder statutes together, we conclude that the legislative intent to allow cumulative punishment is clear. Therefore, we hold that aggravated child abuse is not a lesser included offense of felony murder and that dual convictions are permissible in this context. Accordingly, the judgment of the Court of Criminal Appeals vacating the defendant's aggravated child abuse conviction is reversed and the judgment of the trial court is reinstated.

### Aggravating Circumstance (i)(1) - Narrowing

Relying upon State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), the defendant next contends that the State may not seek the death penalty for a felony murder in the perpetration of aggravated child abuse where the sole aggravating circumstance is Tenn. Code Ann. § 39-13-204(i)(1) – "the murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older." The defendant contends that the aggravating circumstance duplicates the age element of the offense of aggravated child abuse and therefore does not sufficiently narrow the class of death-eligible defendants under the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution. Acknowledging that this aggravating circumstance has been allowed to support a sentence of life without the possibility of parole for felony aggravated child abuse murder, see State v. Lacy, 983 S.W.2d 686, 696 (Tenn. Crim. App. 1997), the defendant points out that Middlebrooks does not apply outside the death penalty context. See State v. Butler, 980 S.W.2d 359 (Tenn. 1998). The defendant also relies upon a law review article which expressed the theory that Middlebrooks precludes the use of aggravating circumstance (i)(1) to impose the death penalty for felony murders based on aggravated child abuse. See Gary R. Wade, The Trexler Saga: Hale & Middlebrooks, 23 Mem. St. L. Rev. 319 (1993).[12]

The State contends that, unlike Middlebrooks, the (i)(1) aggravating circumstance at issue in this case provides meaningful narrowing because the underlying offense, felony murder by aggravated child abuse, applies to all defendants whose murder victims are under eighteen years of age, while the aggravating circumstance applies only to those defendants whose murder victims are under twelve years of age. The State asserts that by narrowing the class of murderers to those whose victims are under the age of twelve, the General Assembly has chosen to recognize the discrepancy in size, strength, and ability between victim and assailant, as well as the heightened vulnerability of younger children, who, generally are less able to defend themselves, describe their assailant, seek assistance, flee the attack, or even to articulate the nature of the crime. Given these factors, the State says that making those who kill such vulnerable victims death-eligible is more than reasonable and constitutes a meaningful narrowing of the class of all murderers.

---

[12] Cf. footnote 3 in State v. James Lloyd Julian, II, No. 03C01-9511-CV-00371, 1997 WL 412539 (Tenn. Crim. App., July 24, 1997)(suggesting that the trial court might err if it allowed a jury considering the death penalty to consider aggravating circumstance (i)(1) where the indictment charged rape of a child or especially aggravated kidnapping as the underlying felony of felony murder).

We begin our analysis with Middlebrooks, where, a majority of this Court held that "when the defendant is convicted of first degree murder solely on the basis of felony murder," use of the felony murder aggravating circumstance is not permissible because it "does not narrow the class of death-eligible murderers sufficiently under the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution because it duplicates the elements of the offense." Id., 840 S.W.2d at 346. In so holding, we observed that

Automatically instructing the sentencing body on the underlying felony in a felony-murder case does nothing to aid the jury in its task of distinguishing between first-degree homicides and defendants for the purpose of imposing the death penalty. Relevant distinctions dim, since all participants in a felony murder, regardless of varying degrees of culpability, enter the sentencing stage with at least one aggravating factor against them.

Id. at 342 (emphasis added).

To determine whether the concern addressed in Middlebrooks exists in this case, we must look again to the felony murder statute under which the defendant was convicted, which defines first degree murder as "[a] killing of another committed in the perpetration of or attempt to perpetrate . . . aggravated child abuse. . . ." Tenn. Code Ann. § 39-13-202(a)(2). Child abuse and neglect is defined as follows:

(a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, that if the abused or neglected child is six years of age or less, the penalty is a Class D felony.

Tenn. Code Ann. § 39-15-401(a) (emphasis added). Child abuse becomes aggravated when the "act of abuse results in serious bodily injury to the child; or . . . a deadly weapon is used." Tenn. Code Ann. § 39-15-402.[13] Under these statutes, felony murder by aggravated child abuse may be committed against a person less than eighteen years old. However, the (i)(1) aggravating circumstance applies only if the victim is less than twelve years old. Unlike the felony murder aggravating circumstance at issue in Middlebrooks, which applied equally to all felony murderers, the (i)(1) aggravating circumstance does not by its terms apply to all aggravated child

---

[13]In its entirety the statute provides:
(a) A person commits the offense of aggravated child abuse or aggravated child neglect who commits the offense of child abuse or neglect as defined in § 39-15-401 and:
(1) The act of abuse or neglect results in serious bodily injury to the child; or
(2) A deadly weapon is used to accomplish the act of abuse.
(b) A violation of this section is a Class B Felony; provided, that, if the abused or neglected child is six (6) years of age or less, the penalty is a Class A felony.

abuse murderers. This aggravating circumstance simply does not duplicate the elements of the underlying offense, felony murder by aggravated child abuse.[14] It narrows the class of death-eligible defendants because it applies to only those defendants whose murder victims are less than twelve years of age. We agree with the State that, in adopting this aggravating circumstance, the General Assembly no doubt recognized that victims under twelve years of age are typically more vulnerable than those between thirteen and seventeen years of age. A younger victim is less able to defend himself or herself and less able to flee. The General Assembly reasonably concluded that persons who attack and abuse these young victims are among the most culpable murderers. See, e.g. Gilson v. State, 9 P.3d 883, 923 (Okla. Crim. App. 2000) (finding legislative action that protects vulnerable children legally justified). Thus, we hold that the (i)(1) aggravating circumstance sufficiently and meaningfully narrows the class of death-eligible defendants, even defendants who have been convicted of felony murder in the perpetration of aggravated child abuse. See also Ex Parte Woodard, 631 So. 2d 1065, 1071-72 (Ala. 1993) (upholding the constitutionality of a similar age of victim aggravating circumstance); State v. Wood, 967 P.2d 702, 716-17 (Idaho 1998); (upholding a similar age of victim aggravating circumstance against a constitutional narrowing challenge); People v. Rissley, 651 N.E.2d 133, 152-53 (Ill. 1995) (upholding a similar age of the victim aggravating circumstance); State v. Wilson, 685 So. 2d 1063, 1071-72 (La. 1996) (upholding a similar age of the victim aggravating circumstance).

## Statutory Comparative Proportionality Review

The Court of Criminal Appeals in a well-reasoned opinion concluded that the sentence of death in this case is disproportionate to the penalty imposed in similar cases. As a result, the Court of Criminal Appeals modified the sentence to life imprisonment without the possibility of parole. In this Court, the State argues that the Court of Criminal Appeals invaded the province of the jury in several respects when it held the defendant's sentence comparatively disproportionate under Tenn. Code Ann. 39-13-206(D). The defendant responds that the Court of Criminal Appeals properly concluded that a death sentence in this case is disproportionate. We agree.

The Tennessee General Assembly has directed appellate courts reviewing capital cases to determine whether "[t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." Tenn.

---

[14] In so stating we are aware that aggravated child abuse is punishable as a Class A felony if the victim is under six years of age. In fact, in Ducker, this Court held that when the State is invoking this enhanced punishment portion of the aggravated child abuse statute, the age of the victim is an essential element of the Class A felony, aggravated child abuse, and as such, must be charged to the jury. Id., 27 S.W.3d at 899. The defendant in Ducker had been convicted of two counts of aggravated child abuse. Therefore, the key issue was the appropriate felony classification for purposes of sentencing. However, when the State is seeking a conviction for felony murder by aggravated child abuse, the enhanced punishment portion of the aggravated child abuse statute is not relevant. If the defendant is found guilty of felony murder by aggravated child abuse, the sentencing provisions for first degree murder will apply, not the sentencing provisions for aggravated child abuse. Therefore, the age of the victim contained in subsection (b) of the aggravated child abuse statute is not an essential element of the offense of felony murder by aggravated child abuse.

-19-

Code Ann. § 39-13-206(c)(1)(D). In State v. Bland, 958 S.W.2d 851 (Tenn. 1997), we undertook an exhaustive analysis of this statutory provision that involved a full inquiry into the language, purpose, jurisprudential background, and legislative history of comparative proportionality review. We emphasized that statutory comparative proportionality is different from traditional Eighth Amendment proportionality analysis, which is the "abstract evaluation of the appropriateness of a sentence for a particular crime." Pulley v. Harris, 465 U.S. 37, 42-43, 104 S. Ct. 871, 875, 79 L. Ed. 2d 29 (1984). In contrast, statutory comparative proportionality review "presumes that the death penalty is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." Bland, 958 S.W.2d at 662 (Tenn. 1997) (quoting Pulley, 465 U.S. at 42-43, 104 S. Ct. at 875-76). The United States Supreme Court has characterized statutory comparative proportionality review as "a check against the random or arbitrary imposition of the death penalty." Gregg v. Georgia, 428 U.S. 153, 206, 96 S. Ct. 2909, 2940-41, 49 L. Ed. 2d 859 (1976).

Comparative proportionality review, however, is not a constitutional imperative or mandate; it is instead a creature of statute. Pulley, 465 U.S. at 50-51, 104 S. Ct. at 879-80 ("There is . . . no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it."); Bland, 958 S.W.2d at 663-64 ("While important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required."). Indeed, following the United States Supreme Court decision in Pulley, nine of the twenty-nine other states which initially conducted comparative proportionality review have either repealed the statutory provisions requiring it or have overruled court decisions mandating it.[15] Significantly, the Tennessee General Assembly has not seen fit to repeal the statute which directs this Court and the Court of Criminal Appeals to conduct comparative proportionality review in all death penalty cases. In addition, the General Assembly has not amended the statute since our comprehensive decision in Bland fully explained the analysis we employ to conduct comparative proportionality review. Accordingly, we will conduct the comparative proportionality review in this case in accordance with the analysis adopted in Bland.

As we have stressed on prior occasions, we do not take lightly our statutory duty to conduct comparative proportionality review in every capital case. See, e.g., State v. Cazes, 875 S.W.2d 253, 270-71 (Tenn. 1994). We employ the precedent-seeking method of analysis. Bland, 958 S.W.2d at 665. This approach requires careful consideration and examination of the case on appeal and other cases in which the defendants were convicted of the same or similar crimes. We examine the facts of the crimes, the characteristics of the defendants, and the

---

[15]See, Willett v. State, 911 S.W.2d 937, 945-46 (Ark. 1995) (stating that Arkansas Supreme Court will no longer conduct proportionality reviews); State v. Salazar, 844 P.2d 566, 583-84 (Az. 1992) (stating that the Arizona Supreme Court will discontinue proportionality review); 1995 Conn. Acts 16, §3(b) (Reg. Sess.) (repealing the statutory provision requiring proportionality review); 1994 Idaho Sess. Laws 127 (S.B. 1302) (same); 1992 Md. Laws 331 (H.B. 590) (same); 1985 Nev. Stat. 527 (same); 1985 Okla. Sess. Laws, Ch. 265, § 1 (same); 1997 Pa.Legis.Serv. Act 1997-28, § 1 (S.B. 423) (same); Wyo. Stat. § 6-4-103(d) (same).

aggravating and mitigating factors involved.  Bland, 958 S.W.2d at 664; see also Tichnell v. State, 468 A.2d 1, 13-23 (Md. 1983).

While statutory comparative proportionality review insures rationality and consistency in the imposition of the death penalty, our function in performing this review is not to search for proof that a defendant's death sentence is perfectly symmetrical with the penalty imposed in all other first degree murder cases, but to identify and invalidate the aberrant death sentence.[16]  In conducting comparative review, we do not act as a "super jury," nor do we second-guess the jury's decision.  Bland, 958 S.W.2d at 668.  Simply stated, if the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed, the sentence of death is disproportionate.  Bland, 958 S.W.2d at 651; State v. Ramsey, 864 S.W.2d 320, 328 (Mo. 1993).

Admittedly, this standard is not easily satisfied.  When the sentencing jury is properly instructed by the trial court and appropriately considers the evidence of aggravating and mitigating circumstances under a statutory scheme that is constitutional, disproportionate death sentences should be the rare exception, not the norm.  The fact that no death sentence has previously been invalidated as disproportionate in Tennessee is an indication that our capital sentencing scheme is functioning properly.  See State v. Cobb, 743 A.2d 1, 125 (Conn. 1999) (noting that disproportionate sentences will be unlikely where the sentencing authority is correctly instructed and appropriately follows the statute); State v. Jacobs, 2001 WL 507878 (La. 2001) (noting that since 1976 only one death sentence had been set aside in Louisiana as disproportionate).  Comparative proportionality review is simply a final safeguard in the initial appellate process to ensure that no aberrant death sentence is affirmed.

While we receive Rule 12 reports from trial judges in "all cases in which the defendant is convicted of first degree murder," Tenn. Sup. Ct. Rule 12; Bland, 958 S.W.2d at 666, we select similar cases for comparative proportionality[17] from a pool that includes only those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held,[18]

---

[16]Gregg, 428 U.S. at 206; 96 S. Ct. at 2940; Bland, 958 S.W.2d at 665; State v. Webb, 680 A.2d 147, 211 (Conn. 1996); State v. Welcome, 485 So. 2d 1235, 1258 (La. 1983); Tichnell, 468 A.2d at 15; State v. McNeill, 485 S.E.2d 284, 289 (N.C. 1997); State v. Bey, 645 A.2d 685 (N.J. 1994);  State v. Rhines, 548 N.W.2d 415, 457 (S.D. 1996); Pirtle, 904 P.2d 245, 276 (Wash. 1995).

[17]As pointed out in Bland, defendants are not precluded from relying upon and utilizing the entire "universe" of first degree murder cases when attempting to establish a claim for selective prosecution under the Equal Protection Clause, see Wayte v. United States, 470 U.S. 598, 608, 105 S. Ct. 1524, 1531, 84 L. Ed.2d 547 (1985).  See Bland, 958 S.W.2d at 666, n.17.

[18]Of the twenty states which still require comparative review, only three states include in the pool all death-eligible homicide convictions or indictments.  See Ga. Code Ann. § 17-10-37(a); State v. Martin, 376 So.2d 300, 312-13 (La. 1979); N.Y. Jud. Law § 211-a (death-eligible indictments).  New Hampshire has not defined the pool for comparison because it has no one on death row, even though it has a capital sentencing scheme.  Of the remaining

(continued...)

-21-

and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death, regardless of the sentence actually imposed.[19] "[B]ecause the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar . . . are those in which imposition of the death penalty was properly before the sentencing authority for determination." Tichnell, 468 A.2d at 15-16; see also Whitfield, 837 S.W.2d, 503, 515 (Mo. 1992); Smith, 931 P.2d 1272, 1285 (Mont. 1996); Rhines, 548 N.W.2d at 455-56. Accord, Flamer v. State, 490 A.2d 104, 139 (Del. 1983). Not included in the pool of similar cases are first degree murder cases in which the State did not seek the death penalty or first degree murder cases in which a sentence other than death was agreed upon as part of a plea bargaining agreement. See Webb, 680 A.2d at 211, Whitfield, 837 S.W.2d at 515. When a defendant pleads guilty, he or she extends a substantial benefit to the criminal justice system, and in exchange, the State is entitled to extend a less harsh sentence than might otherwise be given if the case is submitted to a jury. See State v. Mann, 959 S.W.2d 503, 509 (Tenn. 1997) (citing Brady v. United States, 397 U.S. 742, 752-53, 90 S. Ct. 1463, 1471-72, 25 L. Ed.2d 747 (1970)). Therefore, while the sentence imposed as part of a plea agreement likely will be less harsh than the sentence imposed by a jury after a trial and sentencing hearing, it does not follow that the less harsh sentence resulting from the plea renders the jury sentence aberrant or disproportionate. A sentence imposed by a jury simply cannot logically be compared to a sentence that results from a plea agreement. The circumstances are different in all respects.

In addition, consideration of cases in which the State, for whatever reasons, did not seek the death penalty would necessarily require us to scrutinize what is ultimately a discretionary prosecutorial decision. See Webb, 680 A.2d at 211-12. We previously have declined to review the exercise of prosecutorial discretion, see Cazes, 875 S.W.2d at 253, and it would be particularly inappropriate to do so in conducting comparative proportionality review, where our function is limited to identifying aberrant death sentences, not identifying potential capital cases. Consideration of cases in which the State did not seek the death penalty, in effect, would be using a prior decision of the State as a basis for invalidating a death penalty in an unrelated case.

---

[18](...continued)
sixteen states, eight limit the pool for comparison to cases in which a death sentence actually has been imposed. See Beck v. State, 396 So.2d 645, 664 (Ala. 1980); Williams v. State, 437 So.2d 133, 137 (Fla. 1983); Gall v. Commonwealth, 607 S.W.2d 97 (Ky. 1980); King v. State, 421 So.2d 1009 (Miss. 1982); State v. Palmer, 399 N.W.2d 706, 733 (Neb. 1986); N.J. Stat. Ann. § 2C:11-3; State v. Steffen, 509 N.E.2d 383, 395 (Ohio 1987); State v. Copeland, 300 S.E.2d 63 (S.C. 1982). Eight other states consider cases in which a capital sentencing hearing actually was held and death was a sentencing option, regardless of the sentence actually imposed. See Flamer v. State, 490 A.2d 104, 139 (Del. 1983); State v. Whitfield, 837 S.W.2d 503, 515 (Mo. 1992) (en banc); State v. Smith, 931 P.2d 1272, 1285 (Mont. 1996); State v. Garcia, 664 P.2d 969 (N.M. 1983); State v. Williams, 301 S.E.2d 335, 355 (N.C. 1983); Rhines, 548 N.W.2d at 455 (S.D. 1996); Jenkins v. Commonwealth, 423 S.E.2d 360, 371 (Va. 1992); Wash. Rev. Code Ann. § 10.95.130(2)(b). .

[19]Under current law a sentencing hearing may be conducted to determine whether the sentence should be life imprisonment or life imprisonment without the possibility of parole, even if the State does not seek the death penalty. Tenn. Code Ann. § 39-13-204(a). Under prior law, a penalty hearing was held only if the State sought the death penalty.

Webb, 680 A.2d at 211-12. Such a course could potentially discourage the State both from exercising its discretion to not seek the death penalty and from engaging in plea bargaining with a defendant charged with first degree murder. Indeed, such a course could result in the State seeking the ultimate penalty in every first degree murder case. Id. Proportionality review is not, and was never intended to be, a vehicle for reviewing the exercise of prosecutorial discretion. For these reasons, we do not consider cases in which the State did not seek the death penalty when conducting comparative proportionality review.

Comparative proportionality review also is not a search for disproportionate or aberrant life cases. As we have previously stated, even if a defendant receives a death sentence when the circumstances of the offense are similar to those of an offense for which a defendant has received a life sentence, the death sentence is not disproportionate where the Court can discern some basis for the lesser sentence. See Bland, 958 S.W.2d at 665; State v. Carter, 714 S.W.2d 241, 251 (Tenn. 1986). Our duty under the similarity standard is to assure that no aberrant death sentence is affirmed. Bland, 958 S.W.2d at 665 (citing Webb, 680 A.2d at 203). As the United States Supreme Court so aptly stated: "Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the [death] penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice." Gregg, 428 U.S. at 203, 96 S. Ct. at 2939.

Having defined and explained the pool, we must emphasize that selecting similar cases from that pool is not an exact science because no two crimes or defendants are precisely identical. Bland, 958 S.W.2d at 667. We have various tools available to use in locating similar cases. We review Rule 12 reports, which are not only on file in the Appellate Court Clerk's office in Nashville, but are also now available on CD-ROM, making them more accessible, particularly for defendants.[20] While Rule 12 reports have not been filed in every prior case,[21] this Court and trial judges across this State are working together to ensure that these reports are being filed in current cases and will be filed in future cases. Nonetheless, we emphasize that Rule 12 reports are merely a starting point when conducting comparative proportionality review. These reports are always supplemented by traditional methods of legal research, which enables us to locate written appellate court opinions, which generally are available on first degree murder cases included within the pool for comparison. These written opinions detail the facts and circumstances of each case. Furthermore, like other appellate courts, this Court draws on the experienced judgment and institutional knowledge of its members when evaluating the comparative proportionality of a death sentence. See Bland, 958 S.W.2d at 668 (citing cases); see also State v. Fowler, 548 S.E.2d 684, 704 (N.C. 2001). Such institutional knowledge is an important tool for purposes of comparative proportionality review. Id. To further assist this

---

[20]Before the CD-ROM became available in June of 1999, the only available source for attorneys statewide to review the Rule 12 Reports was in the Appellate Court Clerk's Office in Nashville.

[21]Cazes, 875 S.W.2d at 270-71.

Court, we have directed the State and the defendant to fully brief the issue in each case and to discuss cases and factors relevant to the comparative proportionality inquiry. Bland, 958 S.W.2d at 667. This Court utilizes all the tools at its disposal to conduct a thorough and complete comparative proportionality review in every case.

However, we do not employ a statistical analysis that attempts to quantify the various factors leading to imposition or non-imposition of the death penalty. Id. at 664. Comparative proportionality review is not a rigid, objective test which employs mathematical or scientific techniques. Bland, 958 S.W.2d at 668; Cazes, 875 S.W.2d at 270. This sort of approach has been rightly criticized as an unworkable attempt "to quantify the unquantifiable." See Bland, 958 S.W.2d at 664 (quoting, Webb, 680 A.2d at 209); see also Ramsey, 864 S.W.2d at 327-28.[22] As previously explained, a sentence of death is not disproportionate, unless, the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.

In comparing similar cases, this Court considers many variables including: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. Bland, 958 S.W.2d at 667 (citing cases). In addition, several criteria are relevant to a comparison of the characteristics of defendants which include: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); (8) the defendant's capacity for rehabilitation. Id.

Before we consider the record in this case in light of these factors, we first consider the State's assertion that the Court of Criminal Appeals erred when conducting comparative proportionality review by considering Tennessee cases in which the death penalty was not sought and by considering cases from other jurisdictions. We note that the Court of Criminal Appeals indicated in an order denying the State's petition to rehear that the Tennessee cases in which the death penalty were not sought were used only to provide context and to illustrate the possible remedies, in view of the conclusion that the sentence was disproportionate. The Court of Criminal Appeals also explained that the out-of-state cases were cited to demonstrate "the extensiveness of our research and our concerted effort to reach the right result." Accordingly, the

---

[22]As the North Carolina Supreme Court noted in State v. Williams, 301 S.E.2d 335, 355 (N.C. 1983), "[e]ven those with extensive training in data collection and statistical evaluation and analysis are unable to agree concerning the type of statistical methodology which should be employed if statistical or mathematical models are adopted for purposes of proportionality review." (Citing Baldus, Pulaski, Woodworth and Kyle, Identifying Comparatively Excessive Sentences of Death: A Quantitative Approach, 33 Stan. L. Rev. 1 (1980); Dix, Appellate Review of the Decision to Impose Death, 68 Geo. L. J. 97 (1979)).

Court of Criminal Appeals did not base its decision upon the cases in which the State did not seek the death penalty or the out-of-state cases.

In any event, it is worth reiterating that the pool of similar cases includes only cases in which the death penalty was sought, a sentencing hearing was held, and a sentencing jury determined the appropriate sentence. Whether out-of-state cases should be included in the pool of similar cases for purposes of comparative proportionality review is an issue this Court has not previously addressed. In its jurisprudential history there is no indication that comparative proportionality review was to be conducted on a national scale. Such review generally is performed by at least one state appellate court that has statewide appellate jurisdiction, and therefore, is able to compare a particular death sentence to the penalty imposed in similar cases throughout the state. In Tennessee, comparative proportionality review is a duty imposed upon this Court and the Court of Criminal Appeals by a statute that is part of the Tennessee capital sentencing scheme. Nothing in the statute indicates that the General Assembly intended the term "similar cases" to include out-of-state cases. In addition, given that capital sentencing statutes differ from state to state, cases from other jurisdictions are likely not "similar" for purposes of comparative proportionality review. Accordingly, we agree with the State that out-of-state cases should not be included in the pool of similar cases for purposes of comparative proportionality review.

The State identifies two cases in which the death penalty has been imposed, State v. Keen, 31 S.W.3d 196 (Tenn. 2000) and State v. Torres, No. E1999-00866-CCA-R3-DD, 2001 WL 245137 (Tenn. Crim. App., March 13, 2001), and argues that these cases support its assertion that the Court of Criminal Appeals erred in finding the death sentence in this case disproportionate. The State argues that the question in determining whether a sentence is disproportionate should be "whether, viewing the entire record, the decision of the jury was based in reason as opposed to whim or prejudice." According to the State, if the sentence "is not unreasonable it cannot be deemed aberrant, arbitrary, or capricious."

The defendant responds that the appropriate inquiry in determining whether the sentence is disproportionate is whether the case is "plainly lacking in circumstances consistent with those in which the death penalty has been imposed. . . ." Bland, 958 S.W.2d at 665. According to the defendant, the two cases the State relies upon are not similar to the instant case and, in fact, support the Court of Criminal Appeals' conclusion that the sentence in this case is disproportionate. In addition, the defendant asserts that every other capital case in this state involving a child victim is much more aggravated than the killing in the instant case.

Initially we note that reviewing the record in each case in isolation, as the State suggests, is not the appropriate analysis when conducting comparative proportionality review. The defendant is correct. The relevant inquiry for comparative proportionality review is whether this case, taken as a whole, is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed. Bland, 958 S.W.2d at 665. To determine whether this case can be said to be plainly lacking in circumstances consistent with those in which the death

penalty has been imposed, we will now consider prior capital cases in which the defendant was convicted of murdering a child victim, including those cases relied upon by the State and the defendant.

In Torres, the jury applied two aggravating circumstances: (1) "the victim was less than twelve years of age, and the defendant was eighteen years of age or older;" and (2) "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(1) & (5). As stated in the decision of the Court of Criminal Appeals, the evidence in Torres showed that the twenty-five-year-old defendant was the father of the fifteen-month-old male victim and was caring for the victim on the day of the murder while the child's mother was at work. When the child awoke from a nap and would not stop crying, the defendant struck the child a minimum of five times in the head and abdomen with extreme force. According to Torres' own statement, the child was conscious during and after the abuse and appeared to be in pain. The child had severe internal injuries including hemorrhaging in his brain and in his abdomen, indicating extreme force. In addition, some of the medical experts testified that the victim had marks indicating prior abuse, such as cigarette burns, bite marks, and suspicious scarring around the child's anal area. The defendant did not call for emergency assistance right away; instead he called the child's mother and awaited her arrival. While he waited, the victim stopped breathing, yet the defendant still did not call for emergency assistance. The child's mother called 911 upon her arrival. The defendant refused to provide medical information concerning the victim to nurses at the emergency room, and according to witnesses, appeared unconcerned about his son. The defendant demonstrated little or no remorse for the offense and in a statement to police, blamed the victim's mother for spoiling him and encouraging him to cry. Torres' amenability to rehabilitation was called into question by the testimony of a fellow inmate who stated that Torres had indicated he was participating in a Legal Lives Program to "juke [i.e., mislead] the people, whoever was charging him." Also, proof offered at the sentencing hearing by Torres indicated that at about age fifteen, he had pled guilty to sexually abusing his five-year-old step-brother.

In State v. Keen, 31 S.W.3d 196 (Tenn. 2000), the twenty-seven-year-old defendant was convicted of first degree felony murder of his girlfriend's eight-year-old daughter, committed during the perpetration of a rape. In sentencing the defendant, the jury applied two aggravating circumstances, including the young age of the victim, and the fact that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Id. at 205; Tenn. Code Ann. § 39-13-204(i)(1) & (5). The evidence established that the defendant raped the child while choking her, possibly with a shoelace. Id. at 203-204. When the child stopped breathing, the defendant threw her into a river. Id. at 203. An autopsy revealed multiple scrapes and bruises to the child's face and neck and a deep ligature mark around the front of her neck. Id. at 204. The autopsy further indicated that the child was alive when she was thrown into the river. Id. The defendant was highly intelligent but was suffering from attention deficit disorder, post-traumatic stress disorder, and serious depression. Id. Additionally, the defendant had been sexually abused as a child. Id. at 205. The defendant had no prior criminal record and demonstrated remorse following the offense. Id. at 221.

In State v. Middlebrooks, 995 S.W.2d 550, 561-62 (Tenn. 1999), Middlebrooks, a twenty-four-year-old white male, participated in the brutal torture murder of a fourteen-year-old black male victim and was convicted of felony murder. The evidence showed that the victim was mocked, urinated upon, burned, severely beaten with brass knuckles, cut, raped with a stick, and his genitals were beaten. Two large lacerations formed an "X" across his chest, and two deep stab wounds to his chest eventually caused his death. The victim was alive and conscious during the torture, which lasted for hours, and he was pleading with the defendant, saying that he just wanted to go to school and get an education. The evidence strongly indicated that the torture and killing were racially motivated. Middlebrooks offered evidence in mitigation to show that he had mental problems. No evidence indicated that he felt any remorse for the crime, and there was little evidence to show a strong potential for rehabilitation. The jury imposed the death penalty upon finding a single aggravating circumstance, the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) (1982).

In State v. Vann, 976 S.W.2d 93 (Tenn. 1998), the defendant was convicted of felony murder during the perpetration of a rape of his eight-year-old daughter. The proof indicated that the victim's death was the result of ligature strangulation. The jury applied three aggravating circumstances in sentencing the defendant to death: the young age of the victim, the defendant's prior convictions for aggravated rape, and the fact that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Tenn. Code Ann. § 39-13-204(i)(1), (2) & (5). Medical testimony indicated that the condition of the victim's anus was consistent with ongoing, repeated anal penetration. Witnesses testified that the defendant showed no remorse at the hospital about his daughter's death, and nothing in the record indicated a capacity for rehabilitation.

In State v. Teel, 793 S.W.2d 236 (Tenn.1990), the defendant admitted to the rape and murder of a fourteen-year-old girl. The evidence established that the defendant drove the victim, a person with whom he was well acquainted, to a remote and secluded location by telling her that he was taking her to see her boyfriend. Once there, he forced her to perform fellatio and then vaginally raped her. The cause of death was some type of neck trauma consisting of either manual strangulation, ligature strangulation, or a blow or cut to the neck. The jury found two aggravating circumstances, that the murder was especially heinous atrocious or cruel in that it involved torture or depravity of mind and that the murder was committed during the perpetration of a felony, rape. Tenn. Code Ann. § 39-2-203 (i)(5) & (7) (1982)

In State v. Irick, 762 S.W.2d 121 (Tenn. 1988), the twenty-six-year-old defendant was babysitting a friend's children, including the victim. The defendant raped the seven-year-old victim vaginally and anally. The victim suffocated as the defendant held his hand over her mouth to keep her from screaming. The defendant was convicted by a jury of first degree felony murder and aggravated rape. Following a sentencing hearing, the jury found four aggravating circumstances: the victim was less than twelve years of age; the murder was especially heinous, atrocious or cruel in that it involved torture, or depravity of mind; the murder was committed for

the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and the murder was committed during the perpetration of a felony. Tenn. Code Ann. § 39-2-203 (i)(1),(5), (6) & (7) (1982). The defendant had offered mitigating evidence that he had been under the influence of marijuana or alcohol at the time he committed the offense, and that he had a past mental impairment.

In State v. Coe, 655 S.W.2d 903 (Tenn. 1983), the defendant was a stranger to the eight-year-old victim. He lured her into his car, drove to an isolated spot, and raped her. When Coe completed the rape, the victim told him that Jesus loved him. At that point, the defendant strangled the victim until she turned blue. When the victim did not immediately die from the strangulation, he stabbed her in the neck with a pocket knife and watched as she suffered agonizing death throes. Eventually, he left her to die in the wooded area. Coe was convicted of first degree murder, kidnapping, and aggravated rape. Following the sentencing hearing the jury sentenced the defendant to death upon finding four aggravating circumstances: the murder was committed against a person less than twelve years of age; the murder was especially heinous, atrocious or cruel in that it involved torture, or depravity of mind; the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and the murder was committed while the defendant was engaged in committing or attempting to commit rape. Tenn. Code Ann. § 39-2-203 (i)(1),(5),(6) & (7) (1982). The defendant had offered as mitigating evidence the theory that he had been under the influence of extreme mental or emotional disturbance at the time he committed the offense.

Having reviewed these similar capital cases involving child victims,[23] we next consider the record in this case in light of the factors adopted in Bland. The record reveals that the twenty-two-year-old defendant reacted angrily and unexpectedly when the seven-month-old victim would not stop crying. The defendant threw the victim, inflicting serious and ultimately fatal injuries. The episode occurred in the home the defendant shared with the victim, and the assault had a total duration of only moments. The defendant's conduct certainly was not the result of adequate provocation or justification. Indeed the victim was helpless against the attack. However, there is no evidence to show that the violent acts were premeditated. In fact, the evidence indicates that the defendant's behavior was entirely unexpected and highly unusual. The defendant had no history of abusing the victim. The defendant had been responsible for caring for the victim for several hours in the evening while the victim's mother worked, and the evidence indicated he had treated the victim kindly and with affection, as if the victim were his own child. The defendant had no prior record of felony convictions, although he had prior misdemeanor convictions for joyriding, driving under the influence, and driving on a revoked license. The defendant did not immediately seek assistance for the victim, but the evidence offered at trial indicated that the victim's injuries would not have been immediately apparent, as

---

[23]The dissent asserts that our discussion of Middlebrooks and Teel is inappropriate because they are not "similar" cases as required by statute. We agree with the dissent that these cases are not factually similar to the case under consideration; however, they were relied upon by the defendant to illustrate that every other capital case in Tennessee involving a child victim is much more aggravated than the killing in the instant case. Given the defendant's assertion, our consideration of every prior capital case involving minor victims is appropriate.

there were no external injuries. The defendant cooperated with the authorities during the investigation, allowing them access to the apartment without a search warrant, and turning over to them the crib sheet and blanket as well as his own t-shirt. Although the defendant was not immediately forthcoming with police, he eventually admitted his actions. Disinterested witnesses consistently testified that the defendant appeared genuinely remorseful for the victim's injuries and his eventual death. The defendant offered evidence to suggest that he had been a dependable and capable worker and that he had above average intelligence. Overall, the record suggests an amenability to rehabilitation.

The defendant is the only person in Tennessee to receive a death sentence based solely on the (i)(1) aggravating circumstance, the victim was less than twelve years of age. With respect to mitigation, the defendant offered a great deal of proof, previously summarized herein, about his unstable childhood in a poor, dysfunctional family; indeed, the trial court instructed the jury as to seventeen mitigating circumstances raised by the evidence offered.

Unlike this case, in each of the prior capital cases the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind or serious physical abuse beyond that necessary to produce death. Also, unlike the present case, in each of these prior cases, there was some evidence of sexual abuse. In only one prior case, Middlebrooks, was the jury's sentence of death based upon a single aggravating circumstance, and the evidence to support that aggravating circumstance, evidence of severe and protracted torture, was so clear that to say it was overwhelming is an understatement. Of these prior cases, Torres is most similar to the present case, yet, there are several significant distinctions.[24] Unlike Torres, the evidence in this case indicates that the fatal injuries were consistent with a single act of violence that occurred in a matter of minutes. Although, like Torres, Godsey did not call for emergency assistance immediately, the medical testimony in this case indicates that the victim sustained no apparent external injuries, so it is not clear that Godsey realized the extent of the victim's injuries. When Godsey discovered the victim was not breathing, he immediately alerted the victim's mother, attempted to perform CPR, and called 911. Torres did not immediately call

---

[24]We do not agree with the dissent's assertion that discussion of Torres in this case "may be problematic" since Torres will be reviewed by this Court pursuant to Tenn. Code Ann. § 39-13-206(a)(1)(2000). As previously stated, the pool of similar cases for comparison includes all first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and a sentencing jury determines whether the sentence should be life, life without the possibility of parole, or death. Whether or not an appeal is taken and whether or not any appeal taken is concluded is not relevant to determining which cases are included in the pool. Comparative proportionality review focuses upon the sentencing decisions made by jurors across the State in similar cases, involving similar defendants. Torres clearly is a part of the pool for purposes of comparative proportionality review, and therefore may appropriately be considered and discussed, regardless of the status of any appeal. We emphasize that our discussion of Torres does not constitute a judgment or prejudgment of the validity of his conviction or sentence. It is pertinent here because it is a similar case in which a jury imposed the death penalty, and both the State and the defendant herein relied upon Torres. Unlike the dissent, we discern no problem with discussing Torres in this context.

911, nor did he call when he realized the victim was not breathing. Also unlike Torres, and other capital cases involving child victims, the evidence in this case does not establish torture or serious physical abuse beyond that necessary to produce death. Significantly, there is also no evidence in this case to indicate that the defendant had a prior history of abusive behavior toward the victim or other children. To the contrary, the proof indicated that the defendant had treated the victim well, caring for him and providing for him as if he were his own son. Moreover, unlike Torres, the medical experts agreed that there was no evidence to indicate prior abuse in this case. Also unlike Torres, according to disinterested witnesses, Godsey demonstrated genuine remorse for the victim at the hospital, both upon arrival and upon learning of the victim's death. In addition, the record in this case indicates that Godsey cooperated with the police in providing access to the apartment and in providing physical evidence. Finally, as the Court of Criminal Appeals observed, the record in this case indicates that Godsey is a reliable worker, who has above average intelligence, and is generally amenable to rehabilitation.

Having reviewed and compared this case to prior similar cases in which a sentence of death has been imposed, we conclude that the Court of Criminal Appeals correctly held that the sentence of death in this case is disproportionate. Taken as a whole, this case is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed. As the Court of Criminal Appeals observed:

> [w]hen measured against other capital cases in this State . . .this case stands at one end of the spectrum, with the least evidence of traditional criminal culpability, and with a young defendant having a comparatively favorable prior history and no history of abusing the victim.

Not only is the sentence in this case at one end of the spectrum when considered against capital cases, it is at one end of the spectrum when considered against the following similar cases in which the jury rejected a death sentence and imposed a sentence of life or life imprisonment without the possibility of parole sentence.

In State v. Paul William Ware, No. 03C01-9705-CR-00164, 1999 WL 233592 (Tenn. Crim. App., April 20, 1999), the twenty-five-year-old defendant was convicted of the first degree felony murder of a four-year-old child during the perpetration of rape. The jury found two aggravating circumstances including the young age of the victim and the fact that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Nevertheless, the jury chose to impose a sentence of life imprisonment without the possibility of parole. The evidence established that the defendant was an acquaintance of the victim's family and was found in the victim's apartment lying unclothed and unconscious beside the nude body of the victim. An autopsy revealed that the child had been vaginally and anally raped and had died as a result of asphyxiation. There was evidence that the defendant was extremely intoxicated at the time of the offense. The defendant had no prior record of criminal convictions.

In State v. James Lloyd Julian, II, No. 03C01-9511-CV-00371, 1997 WL 412539 (Tenn. Crim. App., July 24, 1997), the twenty-three-year-old defendant was convicted of first degree felony murder of the three-year-old victim, committed during the perpetration of a kidnapping and rape. The jury found two aggravating circumstances, including the young age of the victim and the fact that the murder was especially heinous, atrocious, and cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Nonetheless, the jury imposed a sentence of life imprisonment without the possibility of parole. The evidence established that the defendant was a friend of the victim's parents. He raped the victim and choked her to death. At the time of the offense, the defendant had consumed a fifth of bourbon and smoked marijuana. Moreover, the defendant had himself been sexually abused as a child by his grandfather and was suffering from a mixed personality disorder and a depressive disorder. He had a prior criminal record which included convictions for drug possession, driving under the influence of an intoxicant, assault, evading arrest, and reckless endangerment.

In State v. Terrence L. Davis, No. 02C01-9511-CR-00343, 1997 WL 287646 (Tenn. Crim. App., June 2, 1997), the twenty-year-old defendant was convicted of the first degree murder by aggravated child abuse of his girlfriend's twenty-two-month-old daughter. As in this case, the sole aggravating circumstance applied by the jury was the young age of the victim. At trial, the evidence established that, the defendant had cared for the victim during the week that she died, while her mother worked. According to the defendant's confession, he "whipped" the victim several days prior to her death for breaking a glass, and "spanked" the victim on the day of her death. When the victim stopped breathing, he called 911. An autopsy revealed that the victim's death was caused by "multiple blunt force injuries," including abrasions, contusions, and broken ribs. The pathologist noted more than fifty impact sites on the child's body. The victim's mother testified that she had never previously observed the defendant abuse the child. The defendant had no prior criminal record. The jury imposed a sentence of life imprisonment.

All first degree murders are horrible, and they are particularly tragic, where, as here, the victim is an innocent, defenseless infant. Yet, our statutory duty in conducting comparative proportionality review is to identify and invalidate aberrant death sentences. Having considered the record in this case in comparison to the circumstances of similar cases, we are of the opinion that, taken as a whole, this case is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed. In fact, the circumstances of this case are substantially less egregious, overall, than the circumstances of similar cases in which a sentence less than death has been imposed. Accordingly, we agree with the Court of Criminal Appeals that the sentence of death imposed in this case is disproportionate to the penalty imposed in similar cases. We therefore affirm the decision of the Court of Criminal Appeals modifying the sentence for the defendant's first degree murder conviction to life imprisonment without the possibility of parole. See Tenn. Code Ann. § 39-13-206(d).

## Conclusion

After carefully reviewing the record and the relevant legal authorities, we conclude that the Court of Criminal Appeals correctly found the sentence of death disproportionate and

correctly modified the defendant's sentence to life imprisonment without the possibility of parole. We reverse that portion of the Court of Criminal Appeals' decision setting aside the defendant's separate conviction for aggravated child abuse. With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals authored by Presiding Judge Gary R. Wade and joined in by Judge James Curwood Witt and Judge Norma McGee Ogle.

_____
FRANK F. DROWOTA, III, CHIEF JUSTICE