IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 5, 2009 Session

## STATE OF TENNESSEE v. CORTEZ GRIFFIN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-02746-47     W. Otis Higgs, Jr., Judge**

**No. W2007-00665-CCA-R3-CD  - Filed December 9, 2009**

The defendant, Cortez Griffin, and two co-defendants, Marquette Milan and Preston Deener, broke into a rooming house to rob the victim, Lannie McMillan, who was fatally shot.  A grand jury indicted the defendant on charges of first degree murder, felony murder, and especially aggravated robbery. The trial court sentenced the defendant to life imprisonment and a concurrent sentence of twenty years for his conviction of especially aggravated robbery.  The defendant has appealed raising issues which we summarize as follows: (1) whether the trial court erred in denying the defendant's motion to suppress his statements which he asserts were not voluntary, were not made subsequent to a intelligent, knowing, and voluntary waiver of rights, were not recorded and were obtained subsequent to unlawful arrests; (2) whether the trial court erred in not granting a mistrial after a police officer testified regarding the content of a co-defendant's statement; (3) whether the trial court erred in denying the defendant's motion to dismiss the felony murder charge; and (4) whether the trial court erred in allowing the testimony of a police officer that it was common for a defendant to minimize his or her role in a crime.  Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which Thomas T. Woodall and Camille R. McMullen, JJ., joined.

Lance R. Chism (at trial and on appeal), Memphis, Tennessee, for the appellant, Cortez Griffin.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Reginald Henderson and Dean DeCandia, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

Background

Hearing on Motion to Suppress

Prior to trial, defense counsel filed a motion to suppress the statements of the defendant taken by police on November 12th, December 12th, and December 14th, 2003. During the course of the investigation, the police developed the defendant as a suspect through information obtained from anonymous telephone calls made to the homicide office. Sergeant Mullins stated that the police received at least one anonymous call in which the caller identified the defendant and the co-defendants, Marquette Milan and Preston Deener, by their first names along with "Fox" and another individual named Nicholas Williams. Subsequently, the police arrested Jarrett Robinson, known by the nickname "Fox," on unrelated charges and he "informed [the police] that he knew who was responsible, and [ ] confirmed that [the defendant] and others were involved." According to Sergeant Mullins, at the time Robinson was arrested he implicated the defendant in the homicide. The police had already questioned the defendant on November 12th and "he said he had no knowledge of what had happened [and that] he wasn't in the area when it occurred." After the police interviewed Robinson, Sergeant Mullins spoke with Deener, "and he gave [Sergeant Mullins] a statement about his participation, and . . . the participation of [the defendant] and Marquette Milan." On December 12th, the police arrested the defendant and brought him to the homicide office for questioning. His mother, Penny Sanderson, later joined him. Sergeant Mullins took Ms. Sanderson and the defendant into an interview room and advised the defendant of the charges and his rights. The defendant and Ms. Sanderson told Sergeant Mullins that they understood their rights, they both signed a waiver of rights form, and the defendant agreed to talk with the police. Sergeant Mullins stated that he advised the defendant of his rights for the first time on November 12th, one month before his arrest. He explained that he typically asked a suspect his educational level and requested that a suspect read a portion of the Advice of Rights Form aloud. On November 12th, Sergeant Mullins used his "typical method" in advising the defendant of his rights. On December 12th, he knew that the defendant could read. However, Sergeant Mullins again gave the defendant the opportunity to read his rights and also asked Ms. Sanderson to read the Advice of Rights Form.

Sergeant Mullins stated that when he spoke to the defendant and his mother for a third time on December 14th at juvenile court, he once more advised the defendant of his rights and both the defendant and Ms. Sanderson signed another Advice of Rights Form. Sergeant Mullins stated that he "again informed [the defendant] of the situation that he was in, in reference to the charge, and the information that [the police] knew[.]" Sergeant Mullins showed the defendant a note that Robinson had written to Deener giving him permission to break the code of silence. The defendant initially said "that Preston and another male had done it and that [he] was just in the area and found out later about it." Sergeant Mullins stated that after the police again confronted the defendant, he "gave [the police] a more truthful statement. . . . consistent with the others." The defendant told the police that "he and Marquette Milan and Preston Deener had gone to the rooming house where Lannie McMillan lived, kicked in the door, went inside, [and] went upstairs to rob him. [W]hen McMillan [came] out, . . . [the defendant] and Marquette started shooting, shot the victim and then fled the house." The defendant also told the police that "later Marquette and Preston returned and removed approximately eight ounces of marijuana from the house[.]" Sergeant Mullins said that after the statement was transcribed, he "gave it to [the defendant and his mother] to read and asked them to

-2-

initial the bottom of each page and sign the last [page] where indicated when they were finished[.]" He said that both the defendant and Ms. Sanderson complied with his request. Sergeant Mullins denied that he promised anything to the defendant in exchange for his statement and also denied that he coerced or threatened the defendant in any way.

On cross-examination, Sergeant Mullins stated that he first met the defendant when he went to a residence located on Willett Avenue "in response to an anonymous phone call[.]" He said the police "had been in that area several times canvassing . . . for witnesses, and every time . . . [they] would receive a call to the office from an anonymous caller saying that [the police] just passed by the people responsible." Sergeant Mullins did not personally receive any of the anonymous calls, but his partner, "Sergeant Parris talked to at least one caller, maybe more than one. . . . [and] Sergeant Norris received a couple of calls while Sergeant Paris and [Sergeant Mullins] were out in the field." Sergeant Mullins returned to the house with members of the police gang unit and brought the defendant, Deener, Milan, and Robinson back to the homicide office where they were detained for questioning. Sergeant Mullins said that when the defendant was brought in, he was "at least in coercive custody."

Sergeant Mullins stated that on November 12th, while the defendant waited in the homicide office for his mother to arrive, no one talked to him about the case. However, he was given the opportunity to use the restroom and to get something to eat. After Ms. Sanderson arrived, she and the defendant were taken into an interview room. Sergeant Mullins stated that the interview began at 5:30 p.m. Sergeant Mullins remembered that "on that specific occasion, . . . [the defendant] read a portion of the Advice of Rights Form aloud, specifically, the portion that says, "[y]ou have the right to remain silent" and that the defendant "did pretty well" reading. The defendant was then told to read the rest of the form to himself. Sergeant Mullins stated that during questioning, the defendant appeared to understand the questions, did not appear slow, and "appeared to be relaxed." The defendant told Sergeant Mullins that he was in the eleventh grade and that the last grade he completed was the tenth grade. Sgt. Mullins stated that during the interview, he was not informed that the defendant attended special education classes. Sergeant Mullins testified that he "had some contact over the years" with mentally retarded individuals. His main concern in dealing with a mentally retarded person was to determine if they were "aware of what is going on and . . . [were] able to process . . . information."

Sergeant Mullins stated that after Deener and Robinson were arrested on unrelated charges, Robinson contacted Sergeant Mullins and said that "he needed to talk to [him] about what happened on Willett, about the homicide." Robinson was brought into the homicide office and interviewed by Sergeant Oliver and Sergeant Fitzpatrick. Sergeant Mullins then interviewed Deener at the Shelby Training Center where he was being held. Deener told Sergeant Mullins that he showed the defendant and Milan the house on Willett Avenue and left. He heard a gunshot and said that "[a]pparently, one of them accidentally fired a round in the house." Deener said that "Milan had a three-eighty and [the defendant] had a nine-millimeter and that they both fired shots because Milan had three rounds left and [the defendant] had zero rounds left when they left the house." The police had previously talked with Deener and Robinson and both had denied any involvement in the

robbery and murder. Sergeant Mullins stated that "[o]ur anonymous caller had given [the police] the same information consistently that Deener and Robinson gave" in their interviews after being arrested on unrelated charges. Based on the statements of Robinson and Deener and corroborating information, Sergeant Mullins arrested the defendant on December 12th.

Sergeant Mullins testified that on December 14th, he again advised the defendant of his *Miranda* rights. Specifically, he reminded the defendant of his right to remain silent and his right to an attorney. Sergeant Mullins handed him an Advice of Rights Form and said "I need you to read this," and allowed him to read it to himself. He then asked the defendant "Do you understand each of these rights I've explained to you?" and the defendant wrote "yes" and signed his name. After the statement was typed, the defendant looked over his statement for "probably five or so minutes, maybe a little longer" and then signed it.

Sergeant James L. Fitzpatrick, with the Memphis Police Department, testified that he and Sergeant Oliver interviewed Robinson on December 10th. Robinson told Sergeant Fitzpatrick that on the night of the murder, "he had borrowed Preston Deener's car to take his child home and when he returned, that he picked up [ Deener] . . . and then they went to the house down on Willett . . . and they sat in the car and discussed the incident[.]" Sergeant Fitzpatrick stated that Robinson implicated the defendant in the robbery and murder and "indicated that [the defendant] had a hand gun that had at one time contained seventeen rounds and that all of the rounds had been expended[.]" Robinson told Sergeant Fitzpatrick "that he took possession of [the defendant's] weapon and that it was disposed of in a boxcar."

The hearing reconvened on April 3, 2006. Lieutenant Daniel W. Parris testified that he was the original case officer assigned to the investigation. Lieutenant Parris stated that the police "had been getting unidentified phone calls to the homicide office" giving information that the individuals responsible for the crimes were "out in front of a certain address." Lieutenant Parris stated that in the first anonymous call, the caller "said it was . . . some kind of a gang activity." At the hearing, Lieutenant Parris reviewed a supplement that he prepared after the first anonymous call and stated he did not recall whether he personally took the first call. He agreed that the supplement did not include the defendant's name.

On April 26, 2006, the hearing reconvened. Dr. Fred Steinberg, a clinical and forensic psychologist, testified that defense counsel retained him to assist in the defense. Dr. Steinberg stated that based on his evaluation of the defendant and his review of the defendant's educational and psychological records, he concluded that the defendant did not have the ability to understand the *Miranda* warnings. Dr. Steinberg conducted clinical interviews and tested the defendant's level of intelligence, adaptive behavior, achievement, personality, and conceptual ability. In Dr. Steinberg's opinion, the defendant was "functioning no better than a six-year-old child in adaptive capabilities and dealing with every day kinds of things." He stated that the defendant was previously diagnosed with mild mental retardation. The tests that Dr. Steinberg conducted indicated "moderate mental retardation." At the time of the evaluation, the defendant was eighteen-years-old and Dr. Steinberg measured him with tests designed for adults. In the past, doctors had evaluated the defendant using

tests designed for children. Dr. Steinberg explained that the use of a different test "could very well account for the difference, the relatively lower score." Dr. Steinberg stated that "conservatively" the defendant was in "the lower end of the mild range of retardation." According to Dr. Steinberg, the defendant's "reading grade level was less than first grade" and "his word reading was at first grade, essentially." Dr. Steinberg stated that in his opinion, the defendant would not have been able to read his *Miranda* rights because they were "written at the fourth grade eighth month level." Dr. Steinberg stated that he read each sentence of the *Miranda* warning aloud to the defendant "and asked him to reply and tell [him] what he thought that meant." The defendant's explanations of the rights indicated that he did not understand his rights as they were presented. Dr. Steinberg stated that he also evaluated Ms. Sanderson. He stated she was mildly retarded and "also ha[d] an inability to understand the *Miranda* rights."

On cross-examination, Dr. Steinberg stated that a mildly retarded person could understand the *Miranda* rights if they were explained by someone "who's very sensitive to the fact that he is retarded." He agreed that he was not present when the officers advised the defendant of his rights. Dr. Steinberg acknowledged that the defendant had been tested and determined competent to stand trial. He agreed that the results of the evaluation for competency to stand trial indicated that the defendant understood the legal process, understood the charges against him, and could participate in his own defense. Dr. Steinberg also conceded that in 2004, testing was stopped due to the defendant's claims that he had never heard of a bird or seen a flashlight. Dr. Steinberg agreed that the defendant's malingering indicated that he understood enough to try to change the outcome of the evaluation. He stated that he would not compare an ability to understand *Miranda* warnings with the competency to stand trial because they were "different levels." Dr. Steinberg agreed that he could not say whether the defendant understood the *Miranda* rights as they were given to him. At a subsequent hearing, the trial court denied the defendant's motion to suppress.

Trial

At trial Officer Michael Hill, with the Memphis Police Department Crime Scene Unit, testified that in November of 2003, he responded to a call reporting a crime at a rooming house located on South Willett Avenue. Officer Hill stated that "in the living room portion downstairs was a body of a male black near the front door and he was dead[.]" Nineteen photographs were identified by Officer Hill as fair and accurate depictions of the crime scene and made trial exhibits. On the photographs, Officer Hill pointed out damage to the rear door, broken glass outside of the rear door, the living room area with placards indicating where spent casings were found, and the victim's body with four placards nearby. He used the photographs to show where other casings were found, what appeared to be bullet holes in the walls, and what appeared to be gunshot wounds to the victim's head.

Sergeant Anthony Mullins testified that he replaced Lieutenant Danny Parris, who was then Sergeant Parris, as the case officer on this investigation. Sergeant Mullins said that the police developed the defendant as a suspect in the investigation because "different people in the office . .

. had received phone calls from an anonymous caller. And [the defendant] was one of the people that was named along with other suspects." He stated that "Preston Deener and Marquette Milan and Jarrett Robinson" were also named by the anonymous caller. With regard to his advising the defendant of his *Miranda* rights and his three interviews with the defendant, Sergeant Mullins' trial testimony was essentially the same as the testimony he had given at the pre-trial hearings. Three Advice of Waiver of Rights forms were identified by Sergeant Mullins as the forms reviewed and signed by the defendant and his mother, Penny Sanderson, on November 12th, December 12th, and December 14th. The defendant's formal statement dated December 14, 2003, was also identified by Sergeant Mullins and read aloud at the trial. The statement included the defendant's admission of responsibility for the homicide, his use of a nine millimeter gun, and his entry into the rooming house to obtain approximately eight ounces of marijuana. In his statement, the defendant also claimed that Milan was the first to fire his gun. Sergeant Mullins identified evidence recovered from the crime scene, specifically, "a gunshot residue kit and six spent bullets . . . obtained from the victim during autopsy." He confirmed that he advised the defendant of his rights before each interview and that his mother was present on each occasion.

On cross-examination, Sergeant Mullins agreed that according to the defendant's statement, Robinson was the lead man of the Vice Lords' gang and that someone nicknamed "Puddin" was "the number two man." Sergeant Mullins confirmed that the defendant's statement indicated that he had no rank in the gang, that Puddin ordered the robbery, and that Deener gave him the weapon to use. The defendant's statement indicated that after the shooting, Milan and Deener went back to the rooming house to get the marijuana, but the defendant did not return to the rooming house. Sergeant Mullins stated that the defendant said "I did not want to do it" and "I did it because of my life. I was worried about my family because they know where I stay at." Sergeant Mullins agreed that on November 12, 2003, the defendant told the police that he was not involved in the shooting and said he was with a girl at the movies. He stated that upon questioning the defendant on December 12th, he again denied involvement in the crimes. Two days later, Sergeant Mullins interviewed the defendant again and he initially denied involvement. However, after the police confronted the defendant with inconsistencies in his story, the defendant gave another version which was transcribed into a formal statement.

On redirect examination, Sergeant Mullins stated that the defendant's other versions of the story had been written down in the form of supplements instead of formal statements. He testified that in his experience, it was common for defendants to minimize their participation in crimes. Sergeant Mullins agreed that the police received conflicting information regarding who fired their weapon first. He said that the defendant and Milan "each pointed the finger at the other as being the first shooter[.]" Sergeant Mullins stated that the defendant indicated to the police his intent to commit the robbery and never claimed that he was ordered to kill anyone.

Dr. O'Brian Cleary Smith, Shelby County Medical Examiner, testified that he performed an autopsy on the victim's body. He identified his autopsy report and photographs taken at the time of the autopsy which were made trial exhibits. Dr. Smith testified that the victim's body had sustained injuries including eleven bullet entrance wounds and stated that two of the entrance wounds could

have been caused by the re-entry of a bullet. Dr. Smith said that he recovered five bullets from the victim's body and one from the victim's clothing. The bullets recovered were of two different calibers. Dr. Smith testified that in his opinion, the victim "died as a result of multiple gunshot wounds." On cross-examination, he agreed that the victim received two gunshot wounds to the head and one gunshot wound to the upper back. The bullets that were recovered from the victim's head and his upper back were total metal casing bullets consistent with a weapon using .380 cartridges. The bullets recovered from the left forearm, the right thigh, and the right elbow were consistent with a nine millimeter weapon.

Teri Arney, a forensic scientist with the Tennessee Bureau of Investigation (TBI), testified that the Memphis Police Department brought evidence to the TBI crime laboratory and requested that they examine fired bullets and fired cartridge casings and to determine the types of weapons used. Ms. Arney stated she "was able to determine that two of [the bullets] [were] .380 auto caliber bullets. . . . [a]nd they [had] both been fired in the same .380 auto firearm." She further stated that "four other bullets . . .[were] 9 millimeter caliber bullets. . . . [a]nd they were also fired in the same firearm." Nineteen cartridges were submitted, "five of them [were] .380 auto caliber cartridge cases. . . .[and] 14 [were] Winchester brand cartridge casings that [were] 9 millimeters."

Analysis

I. Motion To Suppress

From the bench, the trial court denied the defendant's motion to suppress and a written order was entered. In denying the motion, the trial court did not make any findings of fact or conclusions of law. Following an appeal, this court concluded that the entry of an order including findings of fact and conclusions of law regarding its denial of the motion to suppress was necessary for a meaningful appellate review. Accordingly, we remanded the matter to the trial court for an entry of a supplemental order. *See State v. Cortez Griffin*, No W2007-00665-CCA-R3-CD (Tenn. Crim. App., at Jackson, Nov. 17, 2008) (Order). On January 5, 2009, the trial court entered an order denying the defendant's motion to suppress and on January 15, 2009, the trial court entered an amended order denying the defendant's motion to suppress. The record has been supplemented with the trial court's order and amended order which include findings of fact and conclusions of law. We now consider whether the trial court erred in denying the defendant's motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. Nevertheless, an appellate court's review of the trial court's application of law to the facts is purely *de novo*. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the state, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23. Moreover, we note

that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the United States and Tennessee Constitutions protect the accused from compelled self-incrimination. *See* U.S. Const. amend. V; Tenn. Const. art. I, § 9. As a result, police officers are prohibited from using statements made by the accused during custodial interrogation unless the accused has been previously advised of his or her constitutional rights to remain silent and to an attorney, and the accused knowingly, voluntarily and intelligently waives those rights. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Whether waiver of a right is voluntarily, knowingly, and intelligently made is determined by the totality of the circumstances under which the right was waived. *See State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992).

The waiver must be "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting *State v. Stephenson*, 878 S.W.2d 530, 544-45 (Tenn. 1994)). The state has the burden of proving the waiver by a preponderance of the evidence. *State v. Bush*, 942 S.W.2d 489, 500 (Tenn. 1997). But, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citations omitted). "The primary consideration in determining the admissibility of the evidence is whether the confession is an act of free will." *State v. Berry*, 141 S.W.3d 549, 577-78 (Tenn. 2004). In determining whether a juvenile defendant voluntarily and knowingly waived his rights, the court must consider the following factors:

> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
>
> (2) the juvenile's capacity to understand the *Miranda* warnings and the consequences of the waiver;
>
> (3) the juvenile's familiarity with *Miranda* warnings or the ability to read and write in the language used to give the warnings;
>
> (4) any intoxication;
>
> (5) any mental disease, disorder, or retardation; and
>
> (6) the presence of a parent, guardian, or interested adult.

*State v. Callahan,* 979 S.W.2d 577, 583 (Tenn. 1998). The *Callahan* factors are "sufficiently capacious to encompass coercive tactics such as threatening a juvenile with adult prosecution or promising leniency." *Id*. Special care should be used in reviewing purported waivers by juveniles, however, "no single factor such as mental condition or education should by itself render a confession

unconstitutional absent coercive police activity." *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Our supreme court has stated:

> Although there is likely to be a level of deficiency so great that it renders a defendant unable to make a knowing and intelligent waiver, nearly every court to consider the issue has held that mental impairments or mental retardation are factors that must be considered along with the totality of the circumstances. As one court has said, "no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving, and do [sic] waive, the constitutional rights embraced in the Miranda rubric." *Fairchild v. Lockhart*, 744 F.Supp. 1429, 1453 (E.D. Ark. 1989). Among the circumstances courts have considered are the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the *Miranda* rights are explained. As a result, courts tend to reach results that are somewhat fact-specific.

*Blackstock*, 19 S.W.3d at 208. A statement is involuntarily given when "the behavior of the state's law enforcement officials was such as to overbear" the will of the accused and "bring about confessions not freely self-determined." *Berry*, 141 S.W.3d at 578 (citing *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)).

A. Knowing, Intelligent, and Voluntary Waiver of Rights and Voluntary Statement

The defendant asserts that the trial court erred in failing to suppress his statements of November 12th, December 12th, and December 14th. On November 12th, the defendant denied any knowledge of the robbery and homicide and provided an alibi. After his arrest on December 12th, the defendant again denied any involvement in the crimes. On December 14th, the defendant gave an oral admission to robbery and murder and signed a formal written statement. On appeal, the defendant asserts that before making his statements to the police, he did not knowingly, intelligently and voluntarily waive his rights. He argues that although the police advised him of his rights before each interview, he lacked the mental capacity to read or comprehend his rights. The defendant also asserts that his statements were not voluntary, but were the products of coercive behavior by the police, in violation of his constitutional rights.

The trial court's amended order denying the defendant's motion to suppress states in pertinent part:

> On November 12, 2003, [the defendant] was questioned by police, but was not in custodial arrest. The [d]efendant did not say anything incriminating to the police in the form of a confession, but instead he gave the police a false alibi. Sergeant Mullins testified that the defendant told police "he wasn't in the area that night, [he] went to the movies with some girl." The [d]efendant was placed in

custodial custody on this day, and detained for questioning. *Miranda* rights were read to the defendant before questioning and his mother was present.

On December 12, 3003, [the defendant] was arrested at his home [at] 1254 Chelsea based on statements given to the police by Jarrett Robinson and Preston Deener. [The defendant] was again given his *Miranda* rights before the interrogation.

On December 14, 2003, officers interrogated [the defendant] at Shelby County Juvenile Court. Sergeant Mullins [t]estified that he again informed the [d]efendant about his *Miranda* rights before the interrogation. At this interrogation the [d]efendant confessed, and the police again went over his *Miranda* Rights while going over his written confession.

The trial court applied the *Callahan* factors and found that: "the facts do not indicate the [d]efendant did not or could not understand the *Miranda* warnings"; the defendant was "given several opportunities to hear, read, and question the *Miranda* warnings over a five week period . . . [and] displayed understanding of the *Miranda* warnings"; Sergeant Mullins' "assessment that the [d]efendant was able to knowingly, intelligently, and voluntarily waive his *Miranda* rights" was credible; and though the defendant was seventeen years old at the time of the crimes, he" clearly demonstrated an understanding of his Miranda warnings and the process of interrogation." The court also found that the defendant told the police that he had completed the tenth grade, he was currently in the eleventh grade, and he never indicated that he did not understand the language of the *Miranda* warnings. The court found that the defendant demonstrated an ability to read and understand the rights and noted that "[t]here was no mention of his mental retardation or any indication of it." The court also found that the defendant lied during his mental evaluation and lied to conceal his involvement in the crimes. According to the trial court, "the [d]efendant may be mentally retarded, but he ha[d] the mental capacity to understand *Miranda* warnings and knowingly, intelligently, and voluntarily waive them." The court further noted that "the defendant did not speak until he learned that two higher ranking gang members had talked and he knew that the code of silence had been broken." Additionally, the trial court found that the police did not use coercive tactics.

In our view, the record does not preponderate against the trial court's findings that the defendant was given his *Miranda* rights at all three interrogations before he made a statement and that he had the capacity to knowingly, intelligently and voluntarily waive those rights. Further, the record does not preponderate against the court's finding that the police did not use coercive tactics and that the defendant's statements were voluntarily given. According to the testimony of Sergeant Mullins, his unit members would not have talked to an unaccompanied juvenile other than to get a name and find out how to contact a parent. He confirmed that on November 12, 2003, he did not talk to the defendant about the case until his mother arrived. In the meantime, the officers gave the defendant the opportunity to use the restroom and to get something to eat. Sergeant Mullins stated that the defendant told him he was in school, but he did not tell him that he attended special education classes. Sergeant Mullins did not handcuff the defendant during the interview. Before

questioning the defendant, Sergeant Mullins and the defendant went over the *Miranda* rights and the defendant read aloud a portion of the Advice of Rights Form. Sergeant Mullins testified that the defendant read "pretty well," and that he was told to read the rest of the form to himself. Sergeant Mullins explained that he asks subjects to read a portion of the waiver form aloud to test their ability to read. He asked the defendant whether he understood the rights and the defendant indicated that he did. Neither the defendant, nor his mother, indicated that either of them had any mental disorder that would interfere with their ability to understand the form. Sergeant Mullins told the defendant generally what crimes the police were investigating. Sergeant Mullins did not threaten the defendant and he appeared relaxed during the interview. He did not have difficulty understanding or answering questions.

With regard to the December 12th interrogation, Sergeant Mullins stated that he did not require the defendant to read his rights aloud, but he reminded the defendant of the rights and outlined the right to remain silent and the right to a lawyer. Both the defendant and his mother, who was present, appeared to understand the *Miranda* rights. Sergeant Mullins showed the defendant a note written by Robinson stating that the code of silence had been broken and the defendant appeared to read the note.

Sergeant Mullins testified that on December 14th, he interviewed the defendant at the Shelby County Juvenile Court. The defendant's mother was present for the interview. Sergeant Mullins again reviewed the *Miranda* rights before questioning the defendant. He specifically reminded the defendant of his right to remain silent and his right to an attorney and told the defendant to read the Advice of Rights Form to himself. Sergeant Mullins then confirmed that the defendant understood his rights. The defendant wrote "yes" on the Advice of Rights Form beside both questions: "Do you understand each of these rights I've explained to you?" and "Having these rights in mind, do you wish to talk to us now?" The defendant's mother initialed both positive responses and the defendant and his mother signed the form. The defendant then gave a formal statement and he and his mother reviewed the statement for several minutes before signing it.

Although Dr. Steinberg testified that the defendant was unable to read or understand the *Miranda* rights, he agreed that a mildly retarded person could understand the *Miranda* rights if they were explained. He also stated that he was not present when the defendant was given his rights. Dr. Steinberg also agreed that the defendant had been evaluated and determined mentally competent to stand trial. He acknowledged that during testing, the defendant claimed that he had never seen a bird or a flashlight. Dr. Steinberg agreed that the defendant's malingering indicated that he understood enough to try to change the outcome of the evaluation.

The totality of the circumstances support that while the defendant was mildly mentally retarded, he had the ability to understand his *Miranda* rights as they were presented to him on November 12th, December 12th, and December 14th. The record shows that the defendant had the ability for analytical thought and further that he had the mental ability to understand the significance of the evaluation and to try to manipulate its outcome. *See State v. Leon Flannel*, No. W2007-00678-CCA-R3-CD, 2008 WL 4613829, at *12 (Tenn. Crim. App., at Jackson, Oct. 13,

2008), *perm. app. denied* (Tenn. Mar. 23, 2009) (considering as a factor in sustaining the denial of a motion to suppress that the defendant with a low IQ "changed his story when confronted with the victim's phone records and attempted to cast himself as the victim of unwanted sexual advances."). We conclude that the record supports the trial court's findings that on November 12, December 12th, and December 14th, the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights, that the police did not use coercive tactics in obtaining his statements, and that the statements were voluntarily given.

## B. Unlawful Arrest

The defendant asserts that his detention by police on November 12th amounted to an arrest. He argues that he was detained at gunpoint and transported in handcuffs against his will. The defendant claims that his arrest on December 12th was not supported by probable cause. He asserts all three statements were the fruits of unlawful arrests and therefore, the court should have suppressed them.

In addressing the November 12th detention of the defendant for questioning, we must determine whether the defendant was "seized" for Fourth Amendment purposes and if the seizure was legal. In relation to the Fourth Amendment, Tennessee Courts have recognized three distinct types of interactions between law enforcement and citizens: "(1) a full scale arrest which must be supported by probable cause; (2) a brief investigatory detention which must be supported by reasonable suspicion; and (3) brief police-citizen encounters which require no objective justification." *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000) (citations omitted). Furthermore, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred." *Id*. (internal quotation omitted). Therefore, "a 'seizure' implicating constitutional concerns occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave." *Id*. at 425. (citations omitted); *see also State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997).

Generally, "[i]nteractions between the police and the public that are seizures but not arrests, are judged by their reasonableness, rather than by a showing of probable cause." *State v. Kelly*, 948 S.W.2d 757, 760 (Tenn. Crim. App. 1996). "[T]he reasonableness of seizures less intrusive than a full-scale arrest is judged by weighing the gravity of the public concern, the degree to which the seizure advances that concern, and the severity of the intrusion into individual privacy." *State v. Pulley*, 863 S.W.2d 29, 30 (Tenn. 1993). A law enforcement officer may conduct a brief investigatory stop of an individual if the officer has a "reasonable suspicion based upon specific and articulable facts that a criminal offense has been or is about to be committed." *State v. Keith*, 978 S.W.2d 861, 865 (Tenn. 1998) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). In evaluating the validity of an investigatory detention, a court must consider the totality of the circumstances. *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)). These circumstances include, but are not limited to, the officer's "objective observations,

information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders." *Id.*

The defendant asserts that on November 12th, weapons were pulled on the defendant and that he was transported in handcuffs to the homicide office where he was held against his will for five and one half hours and then questioned. In the amended order denying defendant's motion to suppress, the trial court found that on November 12, 2003, the defendant was "not in custodial arrest." The court further found "[t]he [d]efendant was placed in custodial custody on this day, and detained for questioning." The court also found that"[t]he [d]efendant did not say anything incriminating to the police in the form of a confession, but instead he gave the police a false alibi." On appeal, the state concedes that the defendant was taken into custody at gunpoint on November 12th, but also argues that according to Sergeant Mullins testimony, the officers drew their guns for safety concerns when another suspect ran into the house.

Our review of the record reveals that on November 12th, Sergeant Mullins, Sergeant Parris, and members of the police gang unit went to a house on Willett Avenue in response to information received by the homicide office through anonymous telephone calls. When they arrived, Robinson ran inside the house and Sergeant Mullins and his partner drew their weapons and followed Robinson into the house. Sergeant Mullins stated that the defendant might have been placed in handcuffs. However, he did not remember whether the defendant was handcuffed because he did not participate in transporting the defendant for questioning. Sergeant Mullins stated that at the time the defendant was transported he was "at least in coercive custody," meaning the defendant was being detained for questioning. According to Sergeant Mullins, the basis for the custody was that the police "had been in that area several times canvassing . . . for witnesses, and every time . . . receive[d] a call to the office from an anonymous caller saying that [the police] just passed by the people responsible." Sergeant Mullins stated that the defendant provided an alibi, denied involvement in or had no knowledge of the crimes, and was released because the police were not able to establish probable cause. In our view, the seizure of the defendant on November 12th constituted a custodial detention for interrogation. In distinguishing between the different types of seizures, a panel of this court stated that:

> [A]lthough [an investigatory stop or detention] may be justified upon reasonable suspicion supported by specific and articuable facts, [the detention] must be temporary and for a limited purpose. Detention for custodial interrogation-regardless of its label-intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest. In summary, reasonable suspicion of crime is insufficient to justify custodial interrogation even though the interrogation is investigative. [Where] the defendant . . . was admittedly detained for custodial interrogation; . . . the officers had to have probable cause in order to seize and detain him.

*State v. Larico S. Ficklin,* No. W2000-01534-CCA-R3-CD, 2001 WL 1011470, at *7 (Tenn. Crim. App., at Jackson, Aug. 27, 2001) (internal citations and quotations omitted); *see also State v.*

*Johnson,* 980 S.W.2d 414, 422 (Tenn. Crim. App. 1998) (citing *State v. Melson*, 638 S.W.2d 342, 350 (Tenn.1982)).

Accordingly, to be lawful, the custodial detention for interrogation on November 12th must have been supported by probable cause. We conclude that it was not. Detention of the defendant was based upon information gained from a series of anonymous phone calls. "[W]hen information is provided by an anonymous citizen, this raises heightened concerns about the reliability of the information, such as the possibility of false reports, through police fabrication or from vindictive or unreliable informants." *State v. Wilhoit,* 962 S.W.2d 482, 487 (Tenn. Crim. App. 1997) (internal quotation omitted). The analysis of information from an anonymous source involves consideration of the informant's basis of knowledge and reliability and of any corroborating information known to the police. *Pulley*, 863 S.W.2d at 32; *see also State v. Luke*, 995 S.W.2d 630, 637 (Tenn. Crim. App. 1998) (concluding that "[t]he analysis of an anonymous tip involves consideration of the informant's basis of knowledge and reliability and of any corroborating circumstances known to the police."). Therefore, reports from an anonymous informant must meet the *Aguilar/Spinelli* test. *See State v. Jacumin*, 778 S.W.2d 430, 436 (Tenn. 1989); *see also Spinelli v. United States*, 393 U.S. 410 (1969); *Aguilar v. Texas*, 378 U.S. 108 (1964).

Sergeant Mullins' testimony indicates that the custodial detention of the defendant on November 12th was based on information received from anonymous phone calls. The trial court made no findings regarding the basis of the November 12th custodial detention for interrogation of the defendant. The record does not support that at the time of the custodial detention, information provided by anonymous callers was reliable or that it had been corroborated. Therefore, we conclude that the police lacked probable cause to detain the defendant for a custodial interrogation and that the trial court erred in failing to suppress the defendant's November 12th statement as evidence obtained in unlawful seizure. *See State v. Walker*, 12 S.W.3d 460, 467 (Tenn. 2000) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)). However, the defendant's statement merely provided an alibi and did not implicate him in any crime. Also, in a later statement made after his arrest on December 12th, the defendant again denied any involvement in the crimes. As further discussed herein, we conclude that the police had probable cause to arrest the defendant on December 12th and that his statement made on that date was admissible. Therefore, the jury was made aware through admissible testimony that before his confession on December 14th, the defendant denied involvement in the crimes. We conclude that the trial court's failure to suppress the defendant's November 12th statement was harmless error.

Next, we consider whether the trial court erred in failing to suppress the defendant's December 12th and December 14th statements to the police made after his December 12th arrest. The defendant argues that his statements made on December 12th and 14th should have been suppressed because they were obtained as a result of an unlawful, warrantless arrest. Arrest warrants may only issue upon a showing of probable cause. U.S. Const. amend. IV; Tenn. Const., art. I, § 7; Tenn. Code Ann. § 40-6-205 (1997); Tenn. R. Crim. P. 4(a); *Illinois v. Gates*, 462 U.S. 213, 239 (1983); *Jacumin*, 778 S.W.2d at 435. A finding of probable cause "shall be based upon evidence, which may be hearsay in whole or in part provided there is a substantial basis for believing the

source of the hearsay to be credible and for believing that there is a factual basis for the information furnished." Tenn. R. Crim. P. 4(b). Probable cause is "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998) (citation omitted). However, an arrest warrant is not required for an arrest in a felony offense. *See* Tenn. Code Ann. § 40-7-103(a)(3) (1997). A warrantless arrest will be allowed where a felony has been committed and there is probable cause to believe the person arrested has committed the crime. *Id.*; *State v. Marshall*, 870 S.W.2d 532, 538 (Tenn. Crim. App. 1993), *overruled on other grounds by State v Carter,* 988 S.W.2d 145 (Tenn. 1999). Accordingly, the proper inquiry in the instant case is not whether the warrant was lawful, but whether the arrest was lawful. *See State v. Lewis,* 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000) (citations omitted).

In order to effectuate a warrantless arrest, the arresting officers must have probable cause. *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997) (citing *Beck v. Ohio*, 379 U.S. 89, 91(1964); *State v. Jacumin*, 778 S.W.2d at 431; Tenn. Code Ann. § 40-7-103(a)). "Probable cause in the context of a warrantless arrest exists, if at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Lewis*, 36 S.W.3d at 98 (internal quotation omitted). If the arrest is partly based on information provided by an informant from the criminal milieu, the police must be able to show that the informant: "(1) has a basis of knowledge and (2) is credible or his information is reliable." *Id*. (citing *State v. Bridges,* 963 S.W.2d 487, 491 (Tenn. 1997); and *Jacumin*, 778 S.W.2d at 436) (adopting two-prong test of *Aguilar v. Texas*, 378 U.S. 108 (1964) and *Spinelli v. United States*, 393 U.S. 410 (1969), the so-called *Aguilar-Spinelli* test); *cf. State v. Stevens*, 989 S.W.2d 290, 293-94 (Tenn. 1999)).

Both Robinson and Deener are from the criminal milieu and are properly categorized as a criminal informants. A *Jacumin* analysis is necessary to establish the basis for their knowledge and to establish their reliability. The record reflects that after being arrested on unrelated charges, Robinson told Sergeant Fitzpatrick that Deener, Milan, and the defendant informed him of the shooting on the night that it occurred. Robinson also stated that he took the nine millimeter gun used in the homicide by the defendant and threw it in a boxcar. On December 11th, Sergeant Mullins took the statement of Deener. Deener said that he took Milan and the defendant to the house on the night of the homicide and that Milan was armed with a .38 caliber gun and the defendant had a nine millimeter gun. After he left the house, Deener heard shots. When Deener returned, he found that only three rounds remained in Milan's gun and the defendant had no remaining rounds. Robinson and Deener described the events of the crime and their accounts were largely consistent. Their statements supported the defendant's intent and motive in committing the robbery and in firing his weapon in the process. Other evidence gathered from the crime scene prior to the defendant's arrest included shell casings discharged from a nine millimeter gun and bullets from a nine millimeter gun recovered from the victim's body. Also, at the time of the defendant's arrest, anonymous calls had provided information implicating the defendant's involvement in the crimes. On appeal, the defendant concedes that both informants have sufficient basis for their knowledge to meet the first requirement. Additionally, our review of the record reveals that the first

prong requiring a basis for their knowledge was met.  Furthermore, the record supports that the information provided by  Robinson and  Deener was corroborated and that the second prong requiring reliability was satisfied.  Therefore, we conclude that the trial court did not err in finding that officers had probable cause to arrest the defendant on December 12th and further that the defendant's statements made on December 12th and December 14th were not tainted by an illegal arrest.

## C.  Failure to Record Police Interrogations

The defendant next asserts that the trial court erred in failing to suppress his statements to police on the basis that the police failed to electronically record his interrogations.  While acknowledging that the Tennessee Supreme Court has ruled that "neither the state nor the federal constitution requires electronic recording of interrogations," *State v. Godsey*, 60 S.W.3d 759, 771 (Tenn. 2001), the defendant argues for a change in the law.  In *Godsey,* our supreme court recognized that some value would be realized in requiring the recording of interrogations, however it held that the issue of electronically recording custodial interrogations is one more properly directed to the General Assembly. *State v. Rollins*, 188 S.W.3d 553, 564 (Tenn. 2006) (quotations omitted). We are bound by published precedent. *See* Tenn. S.Ct. R. 4(H)(2).  Therefore, based on controlling authority, we conclude that the trial court did not err in denying the defendant's motion for the suppression of his statements based on the police's failure to electronically record his interrogatories.

In summary, we conclude that the trial court properly denied the motion to suppress the December 12th and the December 14th statements of the defendant.  We further conclude that the trial court's failure to suppress the defendant's statement made on November 12th was harmless error.  In light of the foregoing, the defendant is without relief on this issue.

## II.  Mistrial

The defendant asserts that the trial court erred in denying his motion for a mistrial after the jury heard testimony regarding a co-defendant's statement implicating the defendant. Specifically, the defendant argues that the trial court erred in denying his motion for a mistrial after Sergeant Mullins testified that the co-defendant, Marquette Milan, implicated the defendant in his statement. On appeal, the state agrees with the defendant that the testimony was inadmissible hearsay and asserts that "the trial court also properly ruled that a mistrial was not necessary based on the testimony, which, contrary to the defendant's arguments, was not admitted."

The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court.  *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000).  A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared.  *See id.; State v. Jones*, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977).  "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." *State v. Millbrooks*, 819 S.W.2d 441,

443 (Tenn. Crim. App. 1991) (quoting *Arnold*, 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. *Land*, 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. *Id.* When determining whether a mistrial is necessary because inappropriate testimony was presented to the jury, this court considers the following non-exclusive factors: "(1) whether the state elicited the testimony; (2) whether the trial court gave a curative instruction; and (3) the relative strength or weakness of the state's proof." *State v. Lawrence Taylor*, No. W2002-00183-CCA-R3-CD, 2003 WL 402276, at *4 (Tenn. Crim. App., at Jackson, Feb. 14, 2003).

In cross-examining Sergeant Mullins, defense counsel elicited testimony that the defendant asserted in his statement to police that the co-defendant, Milan, fired his weapon first. During the state's redirect examination of Sergeant Mullins, the prosecutor asked a question regarding whether the police had information contradicting the assertion that the co-defendant fired his weapon first. In response, Sergeant Mullins testified that the defendant and the co-defendant "basically. . . pointed the finger at the other as being the first shooter." Defense counsel asked to approach and in a bench conference, the trial court ruled that the statement was hearsay, sustaining the defendant's objection. No curative instruction was requested or given. In a subsequent jury-out hearing, defense counsel again argued that the statement was inadmissible hearsay and further that according to *Bruton*, the statement was a violation of the defendants right to confrontation. Defense counsel requested a mistrial and the court denied the motion. Again, defense counsel failed to request a curative instruction and none was given.

Although the defendant complains that the trial court erred by failing to issue a curative instruction, the record establishes that none was requested. Because the defendant failed to seek a curative instruction at trial, he has waived our consideration of the issue. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Jones*, 733 S.W.2d 517, 522 (Tenn. Crim. App. 1987) (holding that "failure to request curative instructions" is failure to take action "reasonably available to prevent or nullify the harmful effect of an error").

However, our inquiry does not end there. Based upon *Bruton v. United States*, 391 U.S. 123 (1968), the defendant challenges the trial court's denial of a mistrial after Sergeant Mullins' referenced a co-defendant's out of court statement. The criminally accused has the right to confront those who testify against him. Admission of an incriminating statement of a non-testifying co-defendant violates a defendant's constitutional right of confrontation. *Bruton v. United States*, 391 U.S. at 126; *Smart v. State*, 544 S.W.2d 109, 112 (Tenn. 1976). "Although . . . the defendants were not tried jointly, the statements of a non-testifying co-defendant would generally be inadmissible both on constitutional and hearsay grounds." *State v. James Roy Jernigan*, No. 01C01-9709-CC-00414, 1998 WL 668801, at *4 (Tenn. Crim. App., at Nashville, Sept. 29, 1998). Sergeant Mullins' testimony implicates the defendant in the crimes charged by referring to the

statement of Milan, a non-testifying co-defendant. Although, as argued by the state, Milan's remark contradicted the defendant's assertion to the police that Milan was the first shooter and thereby impeached the defendant's statement, the fact remains that Sergeant Mullins's testimony was based on a remark of a non-testifying co-defendant and was a *Bruton* violation. However, the mere finding of a *Bruton* violation, "does not automatically require reversal of the ensuing criminal conviction." *Schneble v. Florida*, 405 U.S. 427, 430 (1972). When the remaining evidence of guilt is overwhelming, "and the prejudicial effect of the co-defendant's admission is insignificant by comparison, the *Bruton* error is harmless beyond a reasonable doubt." *Id*. The record reveals that the state's case against the defendant is strong. The physical evidence supports the defendant's conviction. Further, the defendant admitted in his formal statement to the police that he broke into and entered the rooming house where the victim lived, armed with a nine millimeter gun, shooting the victim multiple times. We conclude that the defendant has failed to show that Sergeant Mullins' reference to the co-defendant's statement implicating the defendant as the first shooter affected the jury's verdict. Therefore, the trial court's failure to exclude the testimony based on a *Bruton* violation was harmless beyond a reasonable doubt. The defendant is without relief on this issue.

### III. Motion to Dismiss the Felony Murder Charge

Again recognizing the Tennessee Supreme Court's opinion in *State v. Godsey,* the defendant asserts that the trial court erred in denying his motion to dismiss the felony murder count of the indictment. In *Godsey*, the Tennessee Supreme Court rejected the claim that our felony murder "statute violates due process by failing to include a culpable mental state." 60 S.W.3d at 759. Under Tennessee law, the felony murder doctrine requires that the state must prove that the underlying felony was committed with the applicable culpable mental state and allows the transfer of that culpability to the homicide. *Id.* Thus, our supreme court has determined that the transfer of the culpable mental state which is allowable pursuant to our felony murder statute is not unconstitutional. *Id.* Again, we are bound by published precedent. *See* Tenn. S.Ct. R. 4(H)(2). Therefore, we conclude that the trial court did not err in denying the defendants motion to dismiss the felony murder charge. Defendant is not entitled to relief on this issue.

### IV. Testimony of Police Officer Based on His Experience

The defendant asserts that the trial court erred in allowing Sergeant Mullins to testify that based on his experience, it was common for a criminal defendant to minimize his or her role in a criminal offense. The defendant argues that that statements made by other defendants to Sergeant Mullins are not relevant to the present case pursuant to Rules 401 and 402 of the Tennessee Rules of Evidence. On appeal, "[t]he standard of review where the decision of the trial judge is based on the relevance of the proffered evidence under Rules 401 and 402 is abuse of discretion." *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997) (footnotes omitted).

The Tennessee Rules of Evidence state that all relevant evidence is generally admissible. Tenn. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence ." Tenn. R. Evid. 401. Sergeant Mullins was not presented or qualified as an expert at trial. Tennessee Rule of Evidence 701 provides that a lay witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue. Tenn. R. Evid. 701(a). Because it is within the province of the jury to draw conclusions from facts in evidence, a "non-expert witness must ordinarily confine his testimony to a narration of facts based on first-hand knowledge and avoid stating mere personal opinions." *State v. Middlebrooks*, 840 S.W.2d 317, 330 (Tenn. 1992), superseded by statute on other grounds as recognized by *State v. Stout*, 46 S.W.3d 689 (Tenn. 2001).

During redirect examination by the state, the prosecutor asked Sergeant Mullins for his opinion regarding a suspects' tendency to minimize his role during an interrogation. After the trial court overruled the objection of defense counsel, the following testimony was admitted:

> Q.    In your experience, Sergeant Mullins, in interviewing defendants, is it common that defendants tend to minimize their roles or their participation in the crime?
>
> A.    Yes, sir.

Tennessee courts have concluded that similar testimony by a police officer is inadmissible. *See State v. Smith*, 42 S.W.3d 101, 112 (Tenn. Crim. App. 2000); *State v. Christopher Kevan Hein*, No. E2003-01793-CCA-R3-CD, 2004 WL 1269304, *9-10 (Tenn. Crim. App., at Knoxville, June 9, 2004), *perm. app. denied* (Tenn. Oct. 11, 2004) (concluding that "the challenged testimony was not admissible as the opinion of lay witnesses").

The state asserts that the purpose of the inquiring into the tendencies of other suspects on redirect examination by the state was to explain the actions of Sergeant Mullins in failing to prepare formal statements. During the cross-examination of Sergeant Mullins, defense counsel brought out that Sergeant Mullins had not prepared formal written statements containing the defendant's first denial of any knowledge of the murder or his later statement that he was present at the crime scene, but did not participate in the murder or robbery. Our review of the questioning on cross-examination confirms that defense counsel challenged the reliability of Sergeant Mullins' method of interrogating the defendant by questioning his selection of what statements to reduce to a formal statement. On redirect, the prosecutor established that Sergeant Mullins was not selectively choosing what to write down, rather he used some discretion in choosing whether to prepare a formal statement or to prepare a supplement. In our view, the additional testimony regarding Sergeant Mullins' experience as to other suspects was relevant to explain why he chose to include some testimony in the form of a supplement while other statements were reduced to a formal statement. However, the fact that the challenged testimony was relevant does not end our inquiry. The testimony must also be helpful to the jury in determining a fact in issue. Moreover, Rule 403 of the Tennessee Rules of Evidence states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially

outweighed by the danger of unfair prejudice[.]"  The reliability of Sergeant Mullins' method in taking the statement of the defendant was challenged by defense counsel thereby making the reliability of the defendant's statement questionable.  Therefore, his experience with other defendants was helpful to the jury in determining the reliability of Sergeant Mullins' selection of what portions of the defendant's interview to reduce to a formal statement.  Consequently, the testimony was helpful to the jury in determining the reliability of the defendant's formal statement.  Moreover, we conclude that the probative value was not outweighed by the danger of unfair prejudice to the defendant.  Thus, the challenged testimony was admissible and the trial court did not abuse its discretion.  However, even if we conclude that the trial court erred in admitting the testimony, the error would be harmless given the strength of the evidence against the defendant.  See Tenn. R. App. P. 36(b)  ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").  The challenged testimony comprises only a brief portion of a large record.  We conclude, therefore, that the defendant is not entitled to relief on this issue.

Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
J.C. McLIN, JUDGE

-20-